**BUCKEYE PRODUCTION CREDIT, ASSOCIATION, et al.,
Plaintiffs,**

v.

**UNITED STATES of America,
et al., Defendants.**

Civ. A. No. 89–2381 (SS).

United States District Court,
District of Columbia.

July 17, 1990.

Keith Robert Fisher, Washington, D.C., for Buckeye Production.

Theodore C. Hirt, Dept. of Justice, Washington, D.C., for U.S.

## MEMORANDUM OPINION

SPORKIN, District Judge.

This matter is before the Court on cross motions for summary judgment. Plaintiffs contend that the defendant Farm Credit Administration ("FCA") unlawfully rejected their applications to amend their charters pursuant to sections 2.0 and 2.10 of the Farm Credit Act of 1971 ("Act"), as amended, 12 U.S.C. §§ 2071(b)(8)(D), 2091(c)(4). Plaintiffs assert that the FCA's refusal to grant such charter amendments was "arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law ... [or] in excess of statutory jurisdiction [or] authority," within the meaning of the Administrative Procedure Act, 5 U.S.C. § 706(2). Plaintiffs seek an order from this Court approving their applications.

Plaintiffs also seek to invalidate two related regulations promulgated by the FCA under the Act, 12 C.F.R. § 614.4070 and 12 C.F.R. § 618.8000. Plaintiffs assert that 12 C.F.R. §§ 614.4070 and 618.8000 constitute an impermissible delegation of the FCA's authority to the district Farm Credit Banks (FCBs) within the farm credit system. Plaintiffs also contend that these two regulations allow anti-competitive behavior by the Farm Credit Administration in violation of the Sherman Antitrust Act, 15 U.S.C. 1 et seq., and the Farm Credit Act of 1971, as amended, 12 U.S.C. § 2001.

Defendants seek summary judgment or dismissal of plaintiffs' complaint. As to Count I of plaintiffs' complaint, defendants contend that summary judgment is warranted because the denial of the charter amendments by the Farm Credit Administration was a reasonable agency decision which is entitled to deference. As to Counts II through IV of plaintiffs' complaint, defendants argue that plaintiffs lack standing to maintain their claims. Alternatively, defendants assert that as a matter of law they are entitled to judgment.

The Court has jurisdiction of the parties and the subject matter of this case under the provisions of the Farm Credit Act of 1971, as amended, 12 U.S.C. §§ 2001 to 2279aa–14, and the Administrative Procedure Act. Venue is proper in this district under 28 U.S.C. § 1391(b) and (e).

## I. FACTUAL BACKGROUND

The Farm Credit System (hereinafter "the System") is a federally created nationwide network of cooperative, borrower-owned banks and lending associations that provide credit to American farmers. The banks and associations which comprise the System are federally chartered. These institutions are owned by their borrower members and operated on a cooperative basis. The Farm Credit Administration ("FCA") is an independent federal agency that is authorized to regulate the System. The FCA was created in 1916 to oversee the nation's farm credit system. Prior to the early 1980's, the System was financially sound and functioning well. The recession of the early 1980's had a devastating impact upon the financial stability of the System.

In response to this agricultural financial crisis, Congress passed a series of legislative acts in the late 1980's which were aimed at restructuring the 75–year–old Farm Credit System. This legislative initiative culminated in the passage of the Agricultural Credit Act of 1987, (1987 Act) Pub.L. 100–233, 101 Stat. 1568 (codified at 12 U.S.C. § 2001 et seq. (Supp.1989)).[1]

The 1987 Act extensively reorganized the system, requiring the merger of some institutions, authorizing the mergers of others, and providing a new line of credit to guarantee bonds issued by the System. The legislation mandated the merger of two categories of banks, Federal Land Banks (FLBs) (which historically provided long-term financing to farmers) and Federal Intermediate Credit Banks (FICBs) (which historically raised capital for short and intermediate loans to farmers). The resulting institutions are called Farm Credit Banks (FCBs). Agricultural Credit Act of 1987, § 410, Pub.L. No. 100–233, 101 Stat. 1637, as amended, Pub.L. No. 100–399, 102 Stat. 999 (1988) (codified at 12 U.S.C. § 2011 note (Supp.1989)). Each district within the Farm Credit System is served by a FCB.[2] The FCBs exercise a degree of

---

1. In 1985, Congress passed the Farm Credit Amendments Act of 1985, Pub.L. 99–205, 99 Stat. 1678 (codified at 12 U.S.C. § 2001 et seq. (Supp.1989)). These amendments delegated greater regulatory authority to the FCA, authorized the merger of certain institutions within the System, and created a new capital corporation to pool and control the surplus of the System's institutions. Specifically, the 1985 Amendments increased the FCA's supervisory powers including the power to issue cease-and-desist orders and to set minimum capitalization levels and standards for interest rates. In 1986, Congress adopted the Farm Credit Act Amendments of 1986, Pub.L. 99–509, 100 Stat. 1874 (codified at 12 U.S.C. § 2001 et seq. (Supp. 1989)). This amendment simply authorized an accounting change.

2. The Farm Credit System is composed of 12 districts. The boundaries of each district may be readjusted by the FCA with the concurrence of the boards of the banks in each district. 12 U.S.C. § 2002 (Supp.1989).

supervisory authority over the associations that operate within the districts. *See* 1987 Act, §§ 1.3, 1.5, Pub.L. No. 100–233, 101 Stat. 1568, 1622–24 (1988) (codified at 12 U.S.C. §§ 2011–2013).

Prior to the 1987 Act, three different categories of Farm Credit System banks operated in each of the 12 geographic districts. First, the Federal Land Banks (FLBs) raised capital and provided long-term loans to farmers through their affiliated Federal Land Bank Associations (FLBAs) (which also serviced the bank loans). Second, the Federal Intermediate Credit Banks (FICBs), raised capital for intermediate- and short-term loans to farmers. The FICBs loaned their funds to affiliated Production Credit Associations (PCAs), which had the authority to make and service direct loans (short- and intermediate-term) to farmers. Finally, a bank for cooperatives, the third category of institution within the farm credit system, extended credit to marketing, purchasing, and business service cooperatives. The nationwide system comprised 37 banks and nearly 800 affiliated FLBAs and PCAs, all of which were overseen by the Farm Credit Administration (FCA).

As a result of the 1987 Act, the Federal Land Bank Associations (FLBAs) were transformed into direct lending agencies (now called Federal Long-term Credit Associations or FLCAs); similarly, PCAs were granted more independence. In addition, all FLCAs (formerly FLBAs) and PCAs which operated within "substantially the same geographic territory" were directed to submit a plan for voluntary merger to their stockholders. 1987 Act, § 411, Pub.L. No. 100–233, 101 Stat. 1568, 1638, as amended, Pub.L. No. 100–399, 102 Stat. 999 (codified at 12 U.S.C. § 2071 note (1988)). However, the plan had to be approved by the supervising FCB and the FCA prior to being submitted to the stockholders of these institutions. *Id.* If the associations voted to merge, the resulting association, an Agricultural Credit Association (ACA), would be formed. An ACA possesses the combined lending authority of a PCA and FLCA, i.e. the authority to make short-

term as well as long-term loans directly to farmers.

Plaintiff, Buckeye Production Credit Association ("Buckeye"), is a PCA chartered by the FCA with the power to make short- and intermediate-term loans within the territory defined in its charter. Buckeye was created by the merger of two former PCAs. Buckeye's chartered territory includes the following eleven (11) counties in Ohio: Crawford, Hancock, Hardin, Lucas, Marion, Morrow, Ottawa, Sandusky, Seneca, Wood, and Wyandot. Complaint, ¶ 5. Plaintiff Federal Land Bank Association of Fostoria, FLCA ("Fostoria"), is an FLCA which resulted from the merger of four former FLBAs. Fostoria has the authority to make long-term loans to farmers within the territory reserved by its charter. Fostoria's chartered territory includes the following sixteen (16) Ohio counties: Crawford, Erie, Hancock, Henry, Huron, Lorain, Lucas, Marion, Ottawa, Paulding, Putnam, Sandusky, Seneca, Van Wert, Wood, and Wyandot. Complaint, ¶ 6. Both Buckeye and Fostoria are products of the dramatic restructuring of the Farm Credit System that took place as a result of the 1987 Act. Both institutions are within the farm credit district that is overseen by the Louisville Farm Credit Bank.

Buckeye and Fostoria are two jointly managed companies that operate under the same service mark. As enumerated above, Buckeye and Fostoria have overlapping territory in nine Ohio counties. Buckeye also operates separately in two counties; Fostoria, in seven counties.

During the period of consolidations, which followed the passage of the 1987 Act, a four-state Agricultural Credit Association called Farm Credit Services of Mid–America ("Mid–America") resulted from the merger of many smaller PCAs and FLBAs. Mid–America is chartered by the FCA to offer long- and short-term credit in all of its geographic territory. The chartered territory of Mid–America includes the entire state of Indiana, most of Kentucky and Tennessee, and seventy-nine of Ohio's eighty-eight counties. Mid–America's territory overlaps with nine counties in which

either Buckeye or Fostoria operate separately but not jointly.

In late January of 1989, Buckeye and Fostoria filed applications with the FCA to amend their charters to allow them to operate in all the counties in which each entity was doing business. *See* Letters from Leon Leiser to David Hill, (Jan. 26, 1989 & Jan. 31, 1989), Administrative Record, at 1–25 (AR). The effect of the charter amendments would have been to enable the two entities to compete directly, with the same lending authority as Mid–America, but without assuming the formal structure of an ACA. In support of their applications, the president of Buckeye and Fostoria, Leon Leiser, stated that the institutions wished to retain their present management structure and to avoid tax consequences of formerly merging into an ACA. On April 20, 1989, the FCA denied Buckeye's and Fostoria's applications to amend their charters, stating that such approval "was not authorized under the remedies provided by the FCA Board to associations affected by 411 mergers." AR, at 48–49, 50–51.

Buckeye and Fostoria also sought FCA approval to make out-of-territory loans pending action on their applications for charter amendments. Letter from John Deal to David Hill (March 23, 1989), AR at 33–38. On April 5, 1990, Buckeye and Fostoria notified the FCA that they would begin to write loans outside their chartered territories, beginning on April 10, 1989, and April 17, 1989, respectively. Letter from John Deal to David Hill (April 5, 1989), AR at 42–44. The FCA ultimately denied the request that was made on March 23, 1989. Letter from William Dunn to Joe Leiser (May 9, 1989), AR at 58. In this letter, Mr. Dunn noted that although the relevant regulation, 12 C.F.R. § 614.4070, regarding applications to make out-of-territory loans, does not require prior FCA approval, the concurrence of "like associations" and the "supervising district bank" is required before an association may act.[3] The letter also stated that it was the FCA's position that the terminology "like associations" should be "interpreted to mean associations providing similar credit services to the borrower." *Id.* Plaintiffs contend that as a result of this regulatory interpretation the FCA has improperly delegated its authority to the district FCBs. Additionally, plaintiffs assert that the practical effect of such an interpretation is to give their competitor, Mid–America, an illegal monopoly on credit services because its members dominate the board of the district bank that is withholding the requisite approval, i.e. the Louisville FCB.

Plaintiffs also challenge a second regulation, 12 C.F.R. § 618.8000. This regulation requires that financially related services be offered through a single program, or, at a minimum, "through common programs within a district."[4] Plaintiffs contend that

---

**3.** Section 614.4070 provides:

(a) A loan to finance eligible borrower operations conducted wholly within the territory of a bank or an association may be made by the bank or association in whose territory the operations are conducted regardless of the residence of the applicant.

(b) A loan to finance eligible borrower operations which are conducted partially within and partially without the territory of an association or bank may be made *if concurrence is obtained from all like supervisory banks responsible for territories in which the operations are conducted.*

(c) A loan to finance eligible borrower operations conducted wholly outside the chartered territory of an association or bank may be made, provided such loans are authorized under policies established by the bank board and approved by the Farm Credit Administration. *If a loan is made to an eligible borrower whose operation is conducted wholly outside the chartered*

*territory of the lending association or bank, concurrence of like associations and the supervising bank(s) in whose territory(ies) the operation is conducted shall be obtained.* (emphasis added).

**4.** 12 C.F.R. § 618.8000 provides in relevant part:

(a) Banks and associations are authorized to establish policies governing the development, implementation, marketing, and offering of technical assistance and to make available to borrowers, members, applicants, and other persons eligible to borrow, such financially related services appropriate to their on-farm, aquatic, and cooperative operations as may be authorized under policies adopted by district and bank boards.

(b) District and bank boards are authorized to establish policies governing the development, implementation, marketing and offering of technical assistance and financially related services programs. These policies require the approval of the Farm Credit Administration and shall meet the following general guidelines:

Mid–America, as a result of having its members sit on the board of the Louisville FCB, can exercise a veto power over any plan for financial services that Buckeye and Fostoria develops, and that this constitutes a violation of the Sherman Act. They also contend that this regulation exceeds the rulemaking authority of the FCA because such a regulation improperly delegates agency authority to the Louisville FCB.

## II. PLAINTIFFS' LEGAL CLAIMS

### A. *Denial of Charter Amendments*

■ In Count I, plaintiffs challenge the FCA's denial of their proposed charter amendments. Buckeye, a PCA, sought approval of a proposed charter amendment pursuant to Section 2.0 of the Farm Credit Act of 1971 (codified at 12 U.S.C. § 2071). Fostoria sought to have its charter amended pursuant to Section 2.10 of the Farm Credit Act of 1971, as amended (codified at 12 U.S.C. § 2091). Plaintiffs assert that the FCA can deny a charter amendment only "for good cause shown," 12 U.S.C. §§ 2071(b)(6), 2091(b)(3), and that this standard has not been met by the FCA. Plaintiffs further contend that this "good cause shown standard" necessarily applies to charter amendment applications as well as initial chartering decisions. Complaint, ¶¶ 16, 17.

The Court disagrees with plaintiff's interpretation of the statutory language. Sections 2071(b)(8) and 2091(c) of Title 12 are the statutory sections that define the authority of the FCA when an application for a charter amendment is made. Section 2071(b)(8) addresses itself to PCAs and provides:

> The Farm Credit Administration shall have the power, under rules and regulations prescribed by the Farm Credit Administration or by prescribing in the terms of the charter to—
>
> (A) provide for the organization of the association;
>
> (B) provide for the initial amount of stock of the association;
>
> (C) *provide for the territory within which the association's operations may be carried on; and*
>
> (D) *approve amendments to the charter of the association.* (Emphasis added).

12 U.S.C. § 2071(b)(8).[5] The language of these sections demonstrates that Congress clearly contemplated that the territories of institutions within the Farm Credit System would be carefully defined and circumscribed. Moreover, sections 2071(b)(8)(D) and 2091(c)(4) expressly delegate to the FCA the authority to approve or reject charter amendments based upon policies prescribed by the FCA itself. Plaintiffs' assertion that the "good cause shown" standard by "implication" applies to the FCA's decision of whether to approve a charter amendment is incorrect. The language of these statutory sections simply imposes the "good cause shown" standard upon the FCA's initial chartering decision.[6]

.... (3) The institutions of the System shall cooperate and coordinate the offering of assistance and services programs. Banks and associations within a district shall offer assistance or services through a single program, or, at a minimum, through common programs within a district.

**5.** Similarly, Section 2091(c) addresses itself to FLCAs (FLBAs) and provides:

The Farm Credit Administration shall have power, in terms of the charter, under rules and regulations prescribed by the Farm Credit Administration—
(1) to provide for the organization of the association;
(2) to provide for the initial amount of stock of the association;

(3) *to provide for the territory within which the association may carry on its operations; and*
(4) *to approve amendments to the charter of such association.*
12 U.S.C. § 2091(c). (Emphasis added).

**6.** Sections 2071 and 2091 establish the process through which PCAs and FLBAs, respectively, are formed. Both sections require a specific number of individuals to come together with the objective of forming either a PCA or a FLBA. Specifically, the relevant statutory sections require 10 or more individuals who meet certain eligibility requirements to voluntarily come together. Once these individuals agree to organize, they must then formulate an "articles of association" which defines the territory within which the proposed association wishes to

Nothing in the statutory language that speaks to the authority of the FCA to approve or disapprove charter amendments imposes a "good cause" standard. Rather, Congress simply delegated to the FCA the authority to approve or disapprove such amendments in a manner consistent with FCA rules and regulations. Of course, the decisions of the FCA must not be arbitrary or capricious.

Plaintiffs also contend that Congress, when it adopted the Farm Credit Act and its subsequent amendments, expressed a preference for granting charter amendments and increased competition within the Farm Credit System. In support of their argument, plaintiffs point to the Congressional declaration of policy and objectives for the Farm Credit System. 12 U.S.C. § 2001(c).[7] Indeed, plaintiffs assert that Congress has mandated that the FCA take any action that is "necessary or appropriate to carry out the policy and objectives" set forth in § 2001(c). 12 U.S.C. 2252(a)(2); Pl.Opp. at 15.

Plaintiffs' arguments are not persuasive. The language of the policy statement is a slender reed upon which to argue that Congress mandated the granting of charter amendments. As discussed above, other sections of the Act make it clear that Congress delegated the authority to the FCA to approve or reject charter amendment applications in accordance with rules and regulations adopted by the agency itself.

*See* 12 U.S.C. §§ 2071(b)(8), 2091(c). Thus, the Act does not clearly and unambiguously express a Congressional intent to mandate the approval of charter amendments.

Plaintiffs contend that the FCA has authority to grant charter amendments without regulatory or statutory restriction. AR at 1, 9. The Court agrees with plaintiffs' interpretation. Nevertheless, such an interpretation does not lead to the conclusion that approval is mandatory. As discussed above, Congress conferred a great deal of authority and discretion upon the FCA. The FCA can either approve or deny charter amendments as long as the action taken is not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Plaintiffs argue that the FCA's denial of their applications for a charter amendment constitutes an abuse of discretion. Plaintiffs seek an order from this Court directing the FCA to grant their applications.

The applicable standard of review requires judicial deference to the agency's judgment. The Court must consider whether the agency's action was based on a consideration of relevant factors and whether there has been a clear error in judgment. *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971). "Al-

operate. 12 U.S.C. §§ 2071(b)(2)–(3), 2091(b)(2)(A). These proposed Articles must then be submitted to the FCB for the district in which the proposed territory lies and they must be accompanied by a statement to subscribe for stock in the district bank in accordance with its requirements. 12 U.S.C. §§ 2071(b)(2), 2091(b)(2)(B). The proposed Articles must then be forwarded to the FCA for final approval or denial. In addition to the Articles, the FCA must receive the recommendations of the district FCB regarding the need for such an additional association to serve the needs of eligible persons within the proposed territory. 12 U.S.C. §§ 2071(b)(5), 2091(b)(4).

7. This Section provides:

It is declared to be the policy of Congress that the credit needs of farmers, ranchers, and their cooperatives are best served if the institutions of the Farm Credit System provide equitable and

competitive interest rates to eligible borrowers, taking into consideration the creditworthiness and access to alternative sources of credit for borrowers, the cost of funds, including any costs of defeasance under section 2159(b) of this title, the operating costs of the institution, including the costs of any loan loss amortization under section 2254(b) of this title, the cost of servicing loans, the need to retain earnings to protect borrowers stock, and the volume of net new borrowing. Further, it is declared to be the policy of Congress that Farm Credit System institutions take action in accordance with the Farm Credit Act Amendments of 1986 in such manner that borrowers from the institutions derive the greatest benefit practicable from the Act: *Provided,* that in no case is any borrower to be charged a rate of interest that is below competitive market rates for similar loans made by private lenders to borrowers of equivalent credit worthiness and access to alternative credit. (emphasis in original).

though this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Id.* Notwithstanding this deference, the agency must also "examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983) (quoting, *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). The question of whether an agency has acted in an arbitrary and capricious manner turns on the extent to which the relevant statute restricts the agency's discretion. *Kreis v. Secretary of the Air Force*, 866 F.2d 1508, 1514 (D.C.Cir.1989). Here, Congress has authorized the FCA to exercise broad discretion when presented with an application to amend a charter. 12 U.S.C. §§ 2071(b)(8), 2091(c). These statutory sections simply confer upon the FCA the "power" to approve or deny charter amendments in accordance with FCA rules and regulations. Given this broad grant of discretionary power, this Court must show great deference to FCA decisions relating to charter amendment applications.

The administrative record (AR) demonstrates that Buckeye and Fostoria fully presented the rationale for their applications to the FCA. AR at 2–68. Indeed, plaintiffs detailed the financial and management concerns which led them to conclude that conversion to an ACA would be inappropriate. AR at 2–3, 10–12, 26–27, 39–40. The FCA considered the positions of Buckeye and Fostoria and its competitor, Mid–America, before rendering its final decisions. AR at 45–47. Moreover, the FCA had issued policy statements on November 22, 1988, and January 6, 1989. AR, 67 & 68. In these policy statements, the FCA addressed situations in which overlapping territory results from the merger of other credit system institutions pursuant to Sec-

tion 411 of the 1987 Act. The FCA concluded that when confronted with such a merger any association which was not involved in the merger could seek to convert to an ACA so as to compete with equal lending authority against the newly merged entity. By permitting such a conversion, an association that was not a party to a merger could obtain the same lending authority enjoyed by a merged entity. Thus, when confronted with a competitive threat from a newly formed ACA, the members of a PCA or FLBA can themselves vote to convert to an ACA.[8] AR at 50–51. An association faced with such a competitive threat also has the option to merge itself with another entity to form an ACA. 12 U.S.C. § 2279c–1.

Plaintiffs concede that these options are available. However, they assert that given their special circumstances resort to either of these options is inappropriate. *See* Letter from Leon Leiser to David Hill (Jan. 26, 1989), AR at 1–25; Letter from Leon "Joe" Leiser to James Thies (Feb. 3, 1989), AR at 26–27. Specifically, in support of their applications for charter amendments, plaintiffs stated that Fostoria decided not to convert or to merge into an ACA because of the federal "tax consequences." AR, at 3. Fostoria wished to maintain "its present structure as a non-taxpaying entity." AR, at 26. Buckeye, in the documents in support of its application for charter amendment, stated that because it shares a joint management with Fostoria conversion to an ACA would "present conflicts of interest for the joint management team." AR, at 3. As an additional basis for granting the charter amendment applications of Buckeye and Fostoria, plaintiffs stated that "significant economies" would result if the territories were expanded to become coextensive. AR, at 3, 11.

After having reviewed all this information, the FCA rejected plaintiffs' charter amendment applications. Both plaintiffs were advised that their applications were denied via letters from David A. Hill, Secretary to the FCA Board to Leon Leiser. In

---

**8.** Indeed, Buckeye notified the FCA of its intent to avail itself of this policy that allows for con-

version. Letter of Leon Leiser to David Hill (Jan. 17, 1989), AR, at 65.

those letters, Mr. Hill attempted to outline the rationale supporting the FCA's decision not to grant the requested charter amendments. Mr. Hill stated:

> Your request for an expanded territory is *not authorized* under the remedies provided by the FCA Board to associations affected by 411 mergers, which require institutions to use the express merger authorities contained in section 7.8 of the Act to achieve lending authorities equivalent to those of section 411 ACAs.

Letter from David Hill to Leon Leiser (April 20, 1989) (emphasis added) (re: Buckeye Application); *see also* Letter from David Hill to Leon Leiser (April 20, 1989) (re: Fostoria Application). Similarly, in response to inquiries made by Ohio Congressman Michael Oxley, Marvin Duncan, Acting Chairman of the FCA, explained the basis for the agency's action in the following manner:

> The FCA Board has not permitted associations to take other steps outside of the express authorities provided by the statute that would result in de facto mergers but that don't directly involve stockholders in the decision. Expanding territory through amended charters while operating under joint management results in such a situation. It has been the Board's belief that the statute intends such steps resulting in a merger to be part of a proposal submitted to the institution's stockholders so that they, the owners of the institution, may exercise their control over the destiny of their credit cooperative....
>
> The FCA has the general power to approve amendments to the charters of associations. However, the agency's interpretation of section 411 and section 7.8 *precludes the FCA from using its general charter amendment authority for the purpose set forth in the request by the Buckeye PCA and the FLBA of Fostoria, FLCA.*

Letter from Marvin Duncan to Honorable Michael Oxley (May 25, 1989), AR at 60–61 (emphasis added). Thus, the FCA has consistently taken the position that it lacks the authority to grant plaintiffs' requests. This Court disagrees. The FCA clearly has the power and the authority to grant charter amendments. The determination as to whether such an amendment should be approved is left to the sound discretion of the FCA and subject to judicial review. In its denial letters, the FCA did not adequately address the merits of plaintiffs' applications. Instead, it took the position that it lacked the authority to grant the relief requested. The FCA's assertion does not comport with this Court's understanding of the provisions of the Farm Credit Act.

At this time, the record is devoid of any specific findings that led the FCA to deny the applications, other than FCA's assertion that it lacked the authority to grant plaintiffs' applications. The Court emphasizes that it takes no position on the merits of plaintiffs' applications. Congress conferred the authority to approve or deny charter amendments upon the FCA, not upon this Court. However, in the exercise of authority, the FCA must provide a reasoned analysis and factual basis for any decision that it makes. *See State Farm, supra.*

Accordingly, this matter must be remanded to the FCA for reconsideration upon the merits. Because the FCA's final decision on remand may moot the issues raised in the remaining counts of plaintiffs' complaint, this Court will not rule on the merits of those claims.