**BUCKEYE PRODUCTION CREDIT ASSOCIATION; Federal Land Bank Association of Fostoria, FLCA, Plaintiffs-Appellees,**

v.

**The FARM CREDIT ADMINISTRATION, Defendant-Appellant.**

No. 92–2137.

United States Court of Appeals, Fourth Circuit.

Argued March 30, 1993.

Decided June 22, 1993.

---

Matthew Miles Collette, Civ. Div., U.S. Dept. of Justice, Washington, DC (Stuart M. Gerson, Asst. Atty. Gen., Richard Cullen, U.S. Atty., Mark B. Stern, on brief), for appellant.

Nels J. Ackerson, Ackerson & Bishop, Chartered, Washington, DC (Stewart A. Block, Nilda M. Mesa, Washington, DC, Harvey B. Cohen, Stewart T. Leeth, Cohen, Gettings, Alper & Dunham, Arlington, VA, on brief), for appellees.

Before HALL, MURNAGHAN, and WILLIAMS, Circuit Judges.

## OPINION

MURNAGHAN, Circuit Judge:

The case presents us with the question of whether Congress, in amending the Farm Credit Act, 12 U.S.C. §§ 2001–2279bb–6, intended to allow competition between any two Farm Credit System lending associations offering the same types of loans within a given territory. If Congress did not explicitly intend to allow such competition, the question becomes whether the Farm Credit Administration exceeded its authority in interpreting and applying the amendments to the Act to permit competition within the formerly exclusive territories of the plaintiffs-appellees.

Buckeye Production Credit Association ("Buckeye") and Fostoria Land Bank Association ("Fostoria"), two jointly managed lending associations within the Fourth Farm Credit District ("Fourth District") claimed in the United States District Court for the Eastern District of Virginia that the Farm Credit Administration ("FCA") had violated their right under the Farm Credit Act (the "Act") to be free from direct competition within their lending territories. The FCA, Buckeye and Fostoria argued, had misconstrued the Agricultural Credit Act of 1987 when it issued a charter to Farm Credit Services of Mid–America ("Mid–America") to operate as an Agricultural Credit Association and to offer short, intermediate, and long-term loans in an area that included Buckeye's and Fostoria's theretofore exclusive territories. The district court found in favor of Buckeye and Fostoria and remanded the matter to the FCA for amendment of Mid–America's charter, but stayed its decision pending appeal.

I.

Some background about the Farm Credit System, the Farm Credit Act, the 1985 and 1987 amendments to the Act, and the parties' lending rights history is necessary to a full understanding of the issue before us. *See generally* Jeffrey R. Kayl, *Farm Credit Amendments Act of 1985: Congressional Intent, FCA Implementation, and Courts' Interpretation (And the Effect of Subsequent Legislation on the 1985 Act)*, 37 Drake L.Rev. 271, 317 (1987–88). The Farm Credit System ("the System") is a nationwide network of federally chartered, cooperative, borrower-owned banks and lending associations that provide agricultural credit to American farmers. The System was first established by the Farm Loan Act of 1916, Pub.L. No. 64–158, 39 Stat. 360, and extensively revised by the Farm Credit Act of 1971, Pub.L. No. 92–181, 85 Stat. 583, current version at 12 U.S.C. §§ 2001–2279bb–6. The System was devised to meet the peculiar credit needs of farmers and ranchers, while encouraging borrower management, control, and ownership of the System. As envisioned by the 1971 Act, the System was a largely decentralized administrative structure administered by regional boards and overseen by the FCA, an independent federal agency established by Executive Order in 1933. Twelve farm credit districts comprise the System; the institutions within each district have been chartered and regulated by the FCA since 1933.

The System, as revised by subsequent amendments to the Act, includes a variety of FCA-chartered institutions. A Farm Credit Bank (FCB) is located in each district and exercises supervisory authority over the associations that operate within the district. *See* 12 U.S.C. §§ 2011–23. Federal Land Bank Associations ("FLBAs") are authorized

to make long-term agricultural real estate loans. *See* 12 U.S.C. §§ 2091–98. Production credit associations ("PCAs") are authorized to make short and intermediate-term loans. *See* 12 U.S.C. §§ 2071–77. Agricultural Credit Associations ("ACAs"), first authorized by mergers mandated by amendments to the Act in 1987, make long-term agricultural real estate loans as well as short and intermediate-term loans. *See* 1987 Act, § 411, Pub.L. No. 100–233, 101 Stat. 1568, 1638, as amended, Pub.L. No. 100–399, 102 Stat. 999 (codified at 12 U.S.C. § 2071 note). Each of those institutions serves and carries out its operations in a specific territory within a district described in the institution's charter.

From 1916 until the early 1980s, the Farm Credit System was financially healthy. In the 1980s, however, economic conditions threatened the System's financial stability. Congress responded to the agricultural financial crisis by passing a series of laws aimed at restructuring and strengthening the System. The first such law was the Farm Credit Amendments Act of 1985 ("1985 Amendments"), Pub.L. 99–205, 99 Stat. 1678 (codified as amended in scattered sections of 12 U.S.C. § 2001–2279bb–6).

The 1985 Amendments gave greater control of the System to the FCA and authorized the merger of certain "like" institutions within the System. The FCA was empowered, for example, to issue cease and desist orders to System institutions for violations of FCA regulations, set minimum capital levels through agency regulations, approve the issuance of System securities, and set criteria for determining interest rates. However, to offset the centralized regulatory powers, and in response to testimony from borrowers complaining of heavy-handed treatment by System member institutions, Congress added some protective provisions to the 1985 Act. Section 5.17(a)(2) provided that

> [i]n issuing charters and certificates of territory for district-wide mergers of associations where stockholders of one or more associations did not approve the merger, the charter of the new or merged association shall not include the territory of the disagreeing association or associations.

12 U.S.C. § 2252. Thus, associations that did not wish to participate in district-wide mergers were permitted to continue operating as exclusive System lenders within their territories.

The 1985 Amendments did not resolve all of the Farm Credit System problems it sought to address, and unfortunately created new ones. Congress continued to revise the Act, attempting to strike a balance between borrower rights and maintenance of a viable Farm Credit System. In 1986 it passed the 1986 Farm Credit Amendment, Pub.L. 99–509, 100 Stat. 1874 (codified as amended in scattered sections of 12 U.S.C. § 2001–2279bb–6), which retreated somewhat from the strong regulatory position taken by the 1985 Act and removed some of the FCA's regulatory power over member institutions. Then just over a year later, lawmakers enacted a comprehensive overhaul of the Farm Credit Act—the Agricultural Credit Act of 1987 ("1987 Act"), Pub.L. 100–233, 101 Stat. 1568 (codified as amended in scattered sections of 12 U.S.C. § 2001–2279bb–6). The 1987 Act permitted still broader member institution discretion in setting policy and making long-term plans. Thus, although the goals of the Farm Credit System remained the same, Congress significantly revised its policy approach to the System's problems several times in less than three years by vacillating between placing more power with the agency on the one hand and with local member institutions on the other.

The 1987 Act encouraged the merger of some System institutions, and authorized the mergers of others. Section 411 mandated that any FLBA and PCA sharing "substantially the same geographic territory" must submit a plan for voluntary merger to their stockholders. 1987 Act, Pub.L. 100–233, § 411, 101 Stat. 1568, 1638, as amended Pub.L. No. 100–399, 102 Stat. 999 (codified at 12 U.S.C. § 2071 note). The idea was to streamline the System, reduce costs and increase efficiency, and ultimately to assist member institutions to provide competitive interest rates. *See* 133 Cong.Rec.E 4988 (statement of Rep. Stallings); 133 Cong.Rec.S. 18458 (statement of Sen. Leahy). Thus a PCA and an FLBA could merge,

creating an ACA, and offer short, intermediate and long-term loans within its chartered territory. Such mergers became known as "Section 411 mergers." Section 7.8 of the 1987 Act granted the FCA the authority to approve Section 411 mergers, and required that the new ACA possess all of the powers granted to its predecessor associations under the Act, and be subject to all of the obligations imposed upon its predecessor associations under the Act. Pub.L. 100–233, § 416, 101 Stat. 1647–48 (codified at 12 U.S.C. § 2279c–1(a)).

The language in the 1987 Act directing FLBAs and PCAs sharing "substantially" the same territory to submit merger proposals to shareholders indicated that Congress was cognizant of the possibility that section 411 mergers would involve the territory of an association that did not wish to participate in the merger. Congress did not, however, specify in any detail how section 411 mergers would be carried out, nor resolve the issue of what to do when a section 411 merger involved territory that overlapped the territory of a non-merging association. It merely provided in Section 7.8 that "[t]he Farm Credit Administration shall issue regulations that establish the manner in which the powers and obligations of the associations that form the merged association are consolidated and, to the extent necessary, reconciled in the merged association." 12 U.S.C. 2279c–1(b)(2).

In implementing the 1987 Act, the FCA issued a Policy Statement, adopted on November 21, 1988, noting that:

> The Farm Credit Administration Board (Board) recognizes that section 411 of the 1987 Act contemplates the possibility of Federal Land Bank Association/Production Credit Association (FLBA/PCA) mergers in which both associations do not share the identical territory. In those situations, it is possible that some of the merger propos-

als submitted under section 411 of the 1987 Acts ... may contain proposed charters for the territory served by either one of the institutions.. Any Agricultural Credit Association (ACA) chartered under section 411 of the 1987 Act[, however,] .... will be authorized by the Board to extend its lending authority for both long and short-term loans throughout the territory included in its charter.

Farm Credit Administration, Policy Statement on Granting Nonexclusive Charters to Associations (Nov. 21, 1988). To provide a remedy for associations affected by a section 411 merger, the Statement went on to declare that: "[I]f a proposed section 411 charter includes territory currently served by a third association which is not a party to the merger, the Board will consider a request from that association to convert its charter to that of an ACA." [1] *Id.* In acting upon such requests, the FCA said it would consider "the best interests of the borrowers and the likelihood of business success." *Id.*

### II.

Appellees Buckeye and Fostoria are located within the Fourth Farm Credit District ("Fourth District") of the System, which consists of Indiana, Kentucky, Ohio, and Tennessee. At the time prior to the actions at issue here, Buckeye, a PCA, provided short and intermediate-term agricultural loans to farmers within its chartered territory, namely, eleven counties in Ohio. Fostoria, an FLBA, provided long-term agricultural loans to farmers within its chartered territory, namely, sixteen Ohio counties. The chartered territories of Buckeye and Fostoria overlapped in nine counties, but because the two are not "like" associations—that is, they offer different types of loans—they were not in direct competition with each other. Nor did they operate in competition with other "like" System member lending associations within their territories. Buckeye operated separately

---

1. On January 6, 1989, the FCA clarified its 1988 Policy Statement providing a remedy to associations affected by a § 411 merger. Briefly, the second FCA Policy Statement explained that "if an association converts to an ACA after a section 411 merger has caused it to have a nonexclusive territory, the resulting territory of that converted ACA could include the territory of a third associ-

ation." Thus, the FCA made clear that "th[e] authority to seek to convert to an ACA charter extends to any other association which will have a nonexclusive charter as a result of the ACA conversion by an association affected by a Section 411 merger." Farm Credit Administration, Policy Statement on Section 411 Mergers Resulting in Nonexclusive Charters (Jan. 6, 1989).

from Fostoria in two counties, and Fostoria operated separately in seven.

After the passage of the 1985 Amendments, the agricultural lending associations in the Fourth District considered merging to form two district-wide associations, one district-wide PCA and one district-wide FLBA. Most of the associations of the Fourth District chose to join in the mergers, but Buckeye and Fostoria did not. Because Section 5.17(a)(2) of the 1985 Amendments protected the exclusive lending territory of non-joining associations, the respective charters issued by the FCA for the new Fourth District PCA and the new Fourth District FLBA excluded from their territories the chartered territories of Buckeye and Fostoria.

Then, shortly after the passage of the 1987 Act, the Fourth District PCA and the Fourth District FLBA—which occupied "substantially the same geographic territory"—voted to merge. The FCA, pursuant to the power granted it under Section 7.8, approved the section 411 merger and chartered Mid–America as an ACA. Mid–America's chartered territory included the entire state of Indiana, the entire state of Tennessee, most of Kentucky, and seventy-nine of Ohio's eighty-eight counties.

Neither Buckeye nor Fostoria were involved in or voted on the section 411 merger. However, Mid–America's chartered territory included the seven counties where Fostoria operated separately from Buckeye because those counties had been part of the Fourth District PCA's chartered territory, and the two counties where Buckeye operated separately from Fostoria because those counties had been part of the Fourth District FLBA's chartered territory. Accordingly, under the charter granted Mid–America to offer short, intermediate and long-term loans throughout its chartered territory, Buckeye and Fostoria were compelled to compete directly with Mid–America.

Due to this "over-chartering" of Buckeye's and Fostoria's formerly exclusive territories, the two institutions suffered substantial business losses. In an effort to stem the losses, both Buckeye and Fostoria requested that the FCA amend their charters to expand their territories to give each association the authority to make loans throughout any county served by either association. The charter amendments, if granted, would have given Buckeye and Fostoria the same range of lending authority (short, intermediate, and long-term) as that enjoyed by Mid–America, thereby allowing these entities to compete directly with Mid–America in their common territory without assuming the formal structure of an ACA. The plaintiffs pursued the charter amendments rather than a merger into an ACA, apparently because of a tax disadvantage that would perhaps ensue from ACA status. In April 1989, the FCA denied the charter amendment applications, stating that such approval "was not authorized under the remedies provided by the FCA to associations affected by 411 mergers."[2]

### III.

Buckeye and Fostoria subsequently filed the instant suit seeking a declaration of the preservation of their exclusive lending rights in their respective territories. They argued that the new charter for Mid–America was subject to the pre-existing limitations on the charters of its predecessors, the Fourth District PCA and Fourth District FLBA, and that therefore Mid–America could not compete with Buckeye and Fostoria in areas in which they had previously exercised exclusive lending authority.

2. Upon denial of the request, Buckeye and Fostoria brought suit in the District Court for the District of Columbia, challenging the FCA's refusal to consider their requested charter amendments. *See Buckeye Production Credit Ass'n v. United States*, 792 F.Supp. 827 (D.C.Cir.1990). The court held that the FCA had erred in stating that it did not have authority to consider the charter amendments, but rejected plaintiffs' argument that the 1987 Act required the FCA to grant the charter amendments. Noting that

"Congress conferred a great deal of authority and discretion upon the FCA" to consider requests to amend charters, the court remanded to allow the FCA to reconsider the requests. *Id.* at 832, 834. On remand, the FCA denied the requested charter amendments, reasoning that granting the amendments would not meet the goal of providing a level playing field for System institutions. The FCA invited the plaintiffs to form separate ACAs or a merged ACA. Plaintiffs did not seek judicial review of that decision.

The district court determined that the FCA had misinterpreted the clear meaning of section 7.8 of the 1987 Act. Section 7.8 reads, in pertinent part:

> Except as otherwise provided by this subchapter, a merged association shall—
>
> (A) possess all powers granted under this chapter to the associations forming the merged association; and
>
> (B) be subject to all of the obligations imposed under this chapter on the associations forming the merged association 787 F.Supp. 578.

12 U.S.C. § 2279c–1(b)(1). According to the district court, this "plain language" evidenced the clear intent of the Congress that all of the obligations (including an obligation not to compete) of the constituent entities of a chartered ACA must be imposed upon the merged association. Under the statute and accompanying FCA regulations, the court reasoned, the Fourth District PCA and FLBA were obligated to lend only within their chartered territories, which did not include Buckeye's two exclusive counties or Fostoria's seven exclusive counties. It held that those obligations carried over to Mid–America under section 7.8 and should have been imposed upon the ACA when the FCA issued its charter.

The district court found that deference to the FCA's interpretation of the 1987 Act, as mandated under *Chevron v. U.S.A., Inc. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984), was unnecessary because Congress's mandate in section 7.8 was unequivocal, and the language of the section—in particular the word 'obligations'—was susceptible to only one plain meaning. *See Chevron,* 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781 (when court reviews an agency's construction of a statute, the first question is whether Congress has directly spoken to the precise question at issue and "[i]f the intent of the Congress is clear, that is the end of the matter").

Although the district court's reasoning is engagingly straightforward, it is premised on a plain meaning reading of a statute that reads, to us, in an uncomfortably ambiguous manner. As the Supreme Court noted in *National R.R. Passenger Corp. v. Boston &*

*Maine Corp.,* —— U.S. ——, ——, 112 S.Ct. 1394, 1402, 118 L.Ed.2d 52 (1992), "[f]ew phrases in a complex scheme of regulation are so clear as to be beyond the need for interpretation when applied in a real context."

The plain reading of the word "obligation" chosen by the district court seems to us to be only one of several meanings that may reasonably be attached to the word, even within the context in which it appears. The word may refer to general duties, as the district court found; however, the word enjoys multiple meanings, among which are an indebtedness, an agreement enforceable by law, or a bond, note, or bill. It is not unreasonable to assume, as did the FCA, that the word, as used in section 7.8, refers only to "financial obligations." The term obligation, after all, which is not defined by Congress in the statute, is used repeatedly in the Act in the context of financial matters. *See Sorenson v. Secretary of the Treasury,* 475 U.S. 851, 860, 106 S.Ct. 1600, 1606, 89 L.Ed.2d 855 (1986) (as a general rule of statutory construction, "identical words used in different parts of the act are intended to have the same meaning").

In addition, the plain meaning ascribed to the word by the district court and urged by appellees Buckeye and Fostoria leads to an interpretation of section 7.8 that is at odds with other provisions of the Act. The Act specifically delegates to the FCA the power to determine how the powers and obligations of two merging associations should be reconciled. 12 U.S.C. § 2279c–1(b)(2). If every single power and duty specific to each merging entity must be carried over exactly as it existed when the 1987 Act was enacted, there would be nothing for the FCA to "reconcile." Such a virtual freeze on the FCA's power to regulate the System's institutions—not to speak of the resulting fixation of territorial boundaries in perpetuity—would take away powers that have been expressly delegated to the agency. *See* 12 U.S.C. §§ 2252(a)(1), 2091(c), 2071(b)(8) (granting the FCA the discretion to modify the boundaries of farm credit districts, adjust the territory of an association, and approve charters and amendments to charters in accordance with regulations adopted by the agency itself). In

fact, if every obligation specific to a merging entity had to be carried over exactly as it existed under the 1985 Act, then section 7.8 would preclude the FCA from ever amending its regulations without exempting all merged ACA's. The FCA would be powerless to do its job, which includes adjusting its policies and regulations to meet changing economic conditions. We do not believe that Congress intended such a result. We must here remember that there are two sides to Buckeye's and Fostoria's losses. They result from an increase of competition and probable improvement from the borrowers' point of view of loan terms, especially interest rates. That is by no means deleterious to farmers or to the Farm Credit System. *See* Kayl, *Farm Credit Amendments Act, supra,* at 317–18 (noting that although an inevitable result of the 1987 Act would be that weak members would be "washed out," the result would be a stronger Farm Credit System).

We find that the 1987 Act is ambiguous with respect to the question of whether the particular regulatory obligation to refrain from lending outside an institution's chartered territory must be carried forward when associations merge to form an ACA. Congress did not specifically address how the associations' exclusive territory rights granted in section 5.17 and the FCA's authority to grant ACA charters pursuant to 411 mergers should be reconciled. Accordingly, our inquiry must be whether the FCA's interpretation and application of the Act is "based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782. In making that inquiry, we must accord "considerable weight" to the FCA's administrative interpretations, especially because the "meaning or reach of [the] statute has involved reconciling conflicting policies, and a full understanding of the force of the statutory policy ... depend[s] upon more than ordinary knowledge respecting the matters subjected to agency regulations." *Id.* at 844, 104 S.Ct. at 2782–83 (quotations and citations omitted).

The Farm Credit Act, with all its various amendments, is a product of Congress's alternating policy approaches to resolution of the recurring tension between efforts to pre-serve borrower rights and local association control while maintaining a financially viable, efficiently operative, and centrally regulated System. Congress's mandate in the 1987 Act that associations covering substantially similar territories must merge presented a practical problem left unresolved by the explicit terms of the Act. The FCA's solution, as expressed in its policy statements and implementing regulations, permits an ACA's lending authority to extend to some areas not previously authorized under the charters of its constituent associations. However, the FCA's policies also allow a non-merging association affected by a section 411 merger to convert to a ACA and exercise full lending authority throughout its territory. Such a resolution seems to us consistent with section 7.8's mandate that the FCA reconcile the powers and obligations of the merging associations. It also seems to us to be in harmony with Congress's various goals of promoting efficiency in the System, preserving local farmer control, creating one-stop credit facilities for borrowers, providing a level playing field between competitive associations, and encouraging mergers between PCAs and FLBAs. In sum, we find that the FCA's interpretation of the Act, as amended, resulting in its approval of a charter to Mid–America that permitted full service lending in areas previously serviced exclusively by Buckeye and Fostoria, is a reasonable construction of the statute.

Accordingly, the district court's holding that Mid–America's charter should be revoked to the extent that it permits lending in Buckeye's and Fostoria's territories is

***REVERSED.***