BUCKEYE PRODUCTION CREDIT
ASSOCIATION, et al.,
**Plaintiffs,**

v.

**FARM CREDIT ADMINISTRATION,**
**Defendant.**

**Civ. No. 91–533–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

March 23, 1992.

Stewart Todd Leeth, Cohen, Gettings, Alper and Dunham, Arlington, Va., for plaintiffs.

Paula Pugh Newett, U.S. Attorney's Office, Alexandria, Va., for defendant.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I. *Introduction*

In this case, plaintiffs, two lending associations within the Farm Credit System, are suing the Farm Credit Administration ("FCA") for allegedly violating their right under the Farm Credit Act, 12 U.S.C. § 2001, *et seq.* (the "Act"), to be free from competition within their exclusive territories. Essentially, at issue here is whether the FCA misconstrued § 7.8 of the Agricultural Credit Act of 1987, Pub.L. 100–233, § 416, 101 Stat. 1568 (codified at 12 U.S.C. § 2279c–1) [hereinafter § 7.8], in issuing Mid–America, an Agricultural Credit

Association ("ACA"), a charter that allowed Mid–America to compete with plaintiffs in their exclusive territories. For the reasons stated below, this Court holds that the FCA misinterpreted § 7.8 when it granted Mid–America a charter allowing Mid–America to offer short, intermediate, and long-term loans throughout an area that included plaintiffs' exclusive territories.

## II. *Background*

The Farm Credit System ("the System") is a nationwide network of cooperative, borrower-owned banks and lending associations that provide agricultural credit to American farmers. The System consists of twelve farm credit districts. Since 1916, the institutions within each district have been chartered and regulated by the FCA, an independent federal agency. Plaintiff, Buckeye Production Credit Association ("Buckeye"), and plaintiff, Fostoria Land Bank Association ("Fostoria") are jointly-managed lending associations within the Fourth Farm Credit District ("Fourth District"), which consists of Indiana, Kentucky, Ohio, and Tennessee. Within the Fourth District, Buckeye, a production credit association ("PCA"), provides short and intermediate-term agricultural loans to farmers within its chartered territory, namely, eleven counties in Ohio. Also within the Fourth District, Fostoria, a federal land bank association ("FLBA"), provides long-term agricultural loans to farmers within its chartered territory, namely, sixteen Ohio counties. The chartered territories of Buckeye and Fostoria overlap in nine counties. Buckeye operates separately in two counties; Fostoria, in seven.

From 1916 to the early 1980s, the Farm Credit System was financially sound and functioning well. In the 1980s, however, economic conditions threatened the System's financial stability. Congress responded to this agricultural financial crisis by passing a series of laws aimed at restructuring the System. The first such law was the Farm Credit Amendments Act of 1985 ("1985 Amendments"). The 1985 Amendments were designed to consolidate and streamline the System by authorizing the merger of certain associations within the System. But significantly, the 1985 Amendments also took into account the importance of local control by providing a remedy to associations that did not want their territories affected by a "district-wide" merger of "like" associations. *See* 1985 Amendments, Pub.L. 99–205, § 201(7), 99 Stat. 1678 (codified at 12 U.S.C. § 2252(a)(2)), [hereinafter § 5.17(a)(2)]. Section 5.17(a)(2) provided that the charter of a district-wide merger of associations could not include the territory of an association whose stockholders did not approve the merger. Thus, if an association disapproved of a district-wide merger, its territory remained unaffected.

Following the 1985 Amendments, 30 of the 35 PCAs in the Fourth District consolidated to form the Fourth District PCA and 53 of the 62 FLBAs in the Fourth District consolidated to form the Fourth District FLBA.[1] Buckeye's stockholders did not approve the merger creating the Fourth District PCA, nor did Fostoria's stockholders approve the merger of the Fourth District FLBA.[2] Accordingly, the FCA exclud-

---

**1.** Specifically, only 32 of the 35 PCAs in the Fourth District submitted a merger proposal to the FCA because the Boards of Directors of 3 of the 35 PCAs did not allow their stockholders to vote on the proposal. Of the 32 PCAs whose stockholders did vote, 2 disapproved of the merger. Thus, the chartered territory of the new Fourth District PCA excluded the territory of the 3 PCAs whose stockholders did not vote and the territory of the 2 disagreeing PCAs.

Likewise, only 59 of the 62 FLBAs in the Fourth District submitted a merger proposal to the FCA because the Boards of Directors of 3 of the 62 FLBAs did not allow their stockholders to vote on the proposal. Of the 59 FLBAs whose

stockholders did vote, 6 disapproved of the merger. Thus, the Fourth District FLBA's chartered territory excluded the territory of the 3 FLBAs whose stockholders did not vote and the territory of the 6 disagreeing FLBAs.

The parties dispute whether these procedures, whereby not every affected association's stockholders voted on the merger proposals, created district-wide associations. *See infra* section III. B.

**2.** More precisely, Buckeye's predecessor associations' stockholders did not approve the merger proposal creating the Fourth District PCA. Likewise, Fostoria's predecessor associations' stockholders did not approve the merger creat-

ed Buckeye's territory from the Fourth District PCA's chartered territory and it excluded Fostoria's territory from the chartered territory of the Fourth District FLBA. Thus, Buckeye did not have to compete within its territory with the Fourth District PCA on short and intermediate-term loans, nor was Fostoria forced to compete with the Fourth District FLBA on long-term loans within its territory. As it happens, however, the Fourth District PCA's chartered territory included the seven counties where Fostoria operated separately from Buckeye, and the Fourth District FLBA's chartered territory included the two counties where Buckeye operated separately from Fostoria. At the time, these so-called "overlapping territories" created no problem because the Fourth District PCA offered loans different from those offered by Fostoria, and the Fourth District FLBA offered different loans from those Buckeye offered.

Following the 1985 Amendments and the formation of the Fourth District PCA and FLBA, Congress discovered that the consolidation provided for by the 1985 Amendments was inadequate to remedy the System's continuing economic crisis. Congress concluded that many of the System's problems resulted from inefficiencies associated with duplicative institutions. To remedy this and provide further assistance to the System, Congress passed the Agricultural Credit Act of 1987 ("1987 Act"), which allowed for further consolidation of entities within the System. In pertinent part, the 1987 Act mandated that any FLBA and PCA sharing substantially the same geographic territory must submit a plan for voluntary merger to their stockholders.[3] *See* 1987 Act, Pub.L. 100–233, § 411, 101 Stat. 1568 (codified at 12 U.S.C. § 2071 note) [hereinafter § 411]. If the stockholders of each of the associations

voted to merge, an Agricultural Credit Association (ACA), would be formed, which, under the 1987 Act, would then possess the combined lending authority of a PCA and a FLBA, that is, the authority to make short, intermediate, and long-term agricultural loans directly to farmers. *See* 1987 Act, § 7.8.

After the 1987 Act, a four-state Agricultural Credit Association, Farm Credit Services of Mid–America ("Mid–America"), was formed in the Fourth District, pursuant to §§ 411 and 7.8. The formation of Mid–America resulted primarily from the merger of the Fourth District PCA and FLBA, as these two institutions shared substantially the same territory.[4] Mid–America's chartered territory included the entire state of Indiana, the entire state of Tennessee, most of Kentucky, and seventy-nine of Ohio's eighty-eight counties.

Buckeye and Fostoria were neither involved in, nor voted on the § 411 merger that created Mid–America. Yet, Mid–America's chartered territory included the seven counties where Fostoria operated separately from Buckeye because those counties had been part of the Fourth District PCA's chartered territory; Mid–America's territory also included the two counties where Buckeye operated separately from Fostoria because those counties had been part of the Fourth District FLBA's chartered territory.[5] Given this, and because the FCA, based on its interpretation of § 7.8, granted Mid–America the power to offer short, intermediate, and long-term loans throughout its chartered territory, Buckeye and Fostoria were compelled to compete directly with Mid–America.

In implementing the 1987 Act, the FCA issued a Policy Statement, adopted on November 21, 1988, noting that:

---

ing the Fourth District FLBA. Buckeye and Fostoria were not formed until their respective predecessor associations merged in 1988.

**3.** The FCA's implementing regulations define "substantially the same geographic territory" as 90% or more of the same territory. *See* 12 C.F.R. § 611.1145(b) (1991).

**4.** Two smaller associations, the FLBA of Minerva and the FLBA of Bellefontaine were also part of the merger.

**5.** Mid–America's chartered territory did not include the nine counties where Buckeye's and Fostoria's charters overlapped because these counties were never a part of the Fourth District PCA's or FLBA's chartered territories.

The Farm Credit Administration Board (Board) recognizes that section 411 of the 1987 Act contemplates the possibility of Federal Land Bank Association/Production Credit Association (FLBA/PCA) mergers in which both associations do not share the identical territory. In those situations, it is possible that some of the merger proposals submitted under section 411 of the 1987 Act ... may contain proposed charters for the territory served by either one of the institutions. Any Agricultural Credit Association (ACA) chartered under section 411 of the 1987 Act[, however,] ... will be authorized by the Board to extend its lending authority for both long and short-term loans throughout the territory included in its charter.

To provide a remedy for associations affected by a § 411 merger, the FCA's 1988 Policy Statement went on to declare that: "[I]f a proposed section 411 charter includes territory currently served by a third association which is not a party to the merger, the Board will consider a request from that association to convert its charter to that of an ACA." [6] Farm Credit Administration, Policy Statement on Granting Nonexclusive Charters to Associations (Nov. 21, 1988). In acting upon such requests, the FCA said it would consider "the best interests of the borrowers and the likelihood of business success." *Id.*

Following the formation of Mid–America and the FCA's two Policy Statements pertaining the § 411 mergers, Buckeye and Fostoria filed applications with the FCA to amend their charters, *see* 12 U.S.C. § 2071, 2091, to allow them to operate in all the counties in which each entity was doing business. The charter amendments, if granted, would have given Buckeye and Fostoria the same range of lending authority (short, intermediate, and long-term) as that enjoyed by Mid–America, thereby allowing these entities to compete directly with Mid–America in their common territory without assuming the formal structure of an ACA.[7] In April 1989, the FCA denied the charter amendment applications, stating that such approval "was not authorized under the remedies provided by the FCA to associations affected by 411 mergers."

Buckeye and Fostoria challenged the denial of their charter amendment applications by filing suit against the FCA in the United States District Court for the District of Columbia. In this suit, Buckeye and Fostoria argued, in pertinent part, that the FCA had authority to grant the charter amendments without regulatory or statutory restriction. *See Buckeye Prod. Credit Assoc., et al. v. United States of Am., et al.,* Civ. No. 89–2381, 1990 WL 359075 (D.D.C. July 16, 1990) [hereinafter *Buckeye I*]. Judge Sporkin agreed, ruling that the FCA had the authority to grant the requested charter amendments, pursuant to 12 U.S.C. § 2071, 2091, notwithstanding the FCA's Policy Statements implementing a remedy to associations affected by § 411 mergers. *Buckeye I* at 13. Nevertheless, Judge Sporkin specifically stated that such an interpretation did not lead to the conclusion that approval of charter amendment applications was mandatory. On the contrary, he found that Congress granted the FCA broad discretion under the statute when presented with an application to amend a charter. And Judge Sporkin further noted that courts must give such decisions great deference provided the FCA furnishes a reasoned analysis and factual

---

**6.** On January 6, 1989, the FCA clarified its 1988 Policy Statement providing a remedy to associations affected by a § 411 merger. Briefly, the second FCA Policy Statement explained that "if an association converts to an ACA after a section 411 merger has caused it to have a nonexclusive territory, the resulting territory of that converted ACA could include the territory of a third association." Thus, the FCA made clear that "th[e] authority to seek to convert to an ACA charter extends to any other association which will have a nonexclusive charter as a result of the ACA conversion by an association affected by a Section 411 merger." Farm Credit Administration, Policy Statement on Section 411 Mergers Resulting in Nonexclusive Charters (Jan. 6, 1989).

**7.** In support of their applications, the president of Buckeye and Fostoria, Mr. Leon Leiser, stated that the institutions wished to retain their present management structure and to avoid the tax consequences of formerly merging into an ACA.

basis for granting or denying an application. *Id.* at 13–15. Because the FCA's denial of the charter amendment applications in *Buckeye I* rested solely on the FCA's incorrect assertion that it lacked authority to grant the charter amendments, Judge Sporkin remanded the applications to the FCA for consideration on the merits and for a reasoned analysis and factual basis for its final decision. *Id.* at 18.

Upon remand, the FCA considered the merits of Buckeye's and Fostoria's charter amendment applications and again denied them. One important factor supporting the FCA's denial was its concern that approval of the charter amendments would run afoul of the "level playing field" goal embodied in its 1988 Policy Statement.[8] In the FCA's view, approval of Buckeye's and Fostoria's charter amendment applications would have been tantamount to a "de facto" § 411 merger, thereby inappropriately allowing Buckeye and Fostoria to enjoy the benefits of an ACA without incurring any of the corresponding obligations or detriments. A second factor cited by the FCA in support of its denial of the charter amendment applications was Buckeye's and Fostoria's jointly-managed operations. Specifically, the FCA concluded that expanding the Buckeye and Fostoria joint-management agreement was inappropriate given that the 1985 and 1987 Amendments to the Farm Credit Act essentially made joint management agreements an undesirable method for streamlining and consolidating System institutions.[9] For these reasons, the FCA again denied Buckeye's and Fostoria's charter amendment applications.

Following the FCA's second denial, Buckeye and Fostoria filed suit in this Court alleging that the FCA issued Mid–America an invalid charter because the charter unlawfully included territory that had previously been served exclusively by Buckeye or Fostoria.[10] Specifically, Buckeye and Fostoria allege: (i) that the FCA violated § 5.17(a)(2) by issuing a competitive charter to Mid–America that included Buckeye's and Fostoria's territories without first obtaining their approval; (ii) that the FCA regulation implementing § 5.17(a)(2) is invalid because it contradicts the statute; (iii) that the FCA Board's November 22, 1988, and January 6, 1989, Policy Statements implementing § 411 are invalid because they were issued contrary to the rule-making provisions of the Administrative Procedures Act ("APA"), 5 U.S.C. §§ 551–557; and (iv) that the FCA has violated its enumerated powers by issuing policy statements, rather than rules and regulations, that affect the operations and structures of System institutions. These issues were thoroughly addressed by the

8. This goal was to be accomplished by allowing an association affected by an ACA after a § 411 merger to convert into its own ACA or to merge with another affected association and become an ACA. Such an association would then be an ACA and therefore, authorized to offer the same range of loans as that offered by an ACA resulting from a § 411 merger.

9. Joint management agreements were initiated by System associations at a time when no other alternatives existed under the Act for combining System institutions. Over time, the FCA found many aspects of joint management agreements undesirable. Such aspects included, among others: (i) the potential for conflicts of interest; (ii) the provisional nature of such agreements, reflected by the fact that they could be terminated by the action of either association's board of directors or stockholders; and (iii) the lack of efficient operations in comparison to a single association, as reflected by, among other things, the separate accounting and loan processing systems, the separate business and capital plans,

and the separate reports that must be prepared for the FCA and the stockholders. *See* Letter from FCA to Mr. Ruggles, Chairman of the Board of Directors of Buckeye PCA, and Mr. Lust, Chairman of the Board of Directors of Fostoria FLBA (Mar. 14, 1991).

10. Actually, plaintiffs' complaint contains a contradiction. The introductory paragraph of plaintiffs' Complaint for Declaratory Judgment states that plaintiffs "bring this action for review of final administrative agency action", yet plaintiffs' numbered paragraph 16 states that "[t]he[ ] [FCA's] denials [of our charter amendments] are not being appealed here and are not the subject of this action." The Court concludes that it should construe the complaint liberally by ignoring the first paragraph because it is inherently inconsistent with the causes of action in the complaint. None of the four counts in the complaint ask the Court to review the FCA's denial of Buckeye's and Fostoria's charter amendment applications.

parties through written briefs and oral argument on their cross-motions for summary judgment.[11] After hearing the oral argument on these issues, the Court's focus shifted to whether Buckeye and Fostoria had any rights arising out of the merger of the Fourth District PCA and FLBA that carried over to protect them after the § 411 merger of Mid–America. The parties addressed that issue in supplemental memoranda. The Court has now considered all of the parties' arguments and because there are no material facts in dispute, the parties' cross-motions for summary judgment are now ripe for disposition.

### III. *Analysis*

A. Res Judicata

■ The FCA argues that Judge Sporkin's prior decision in *Buckeye I* and the operation of *res judicata* preclude Buckeye and Fostoria from bringing this lawsuit. This argument, while correct in part, fails to resolve the entire case.

The doctrine of *res judicata* provides that "a judgment on the merits in a prior suit bars a second suit involving the same parties or their privies based on the same cause of action." *Nash County Bd. of Educ. v. Biltmore Co.*, 640 F.2d 484, 486 (4th Cir.) (citations omitted), *cert. denied*, 454 U.S. 878, 102 S.Ct. 359, 70 L.Ed.2d 188 (1981). If a final judgment on the merits exists, it binds the parties to the prior suit " 'not only as to every matter which was offered and received to sustain or defeat the claim or demand, but [also] as to any other admissible matter which might have been offered for that purpose.' " *Aliff v. Joy Mfg. Co.*, 914 F.2d 39, 43 (4th Cir.1990) (quoting *Sea–Land Serv., Inc. v. Gaudet*, 414 U.S. 573, 579, 94 S.Ct. 806, 812, 39 L.Ed.2d 9 (1974)). The purpose of the rule is to provide for finality in litigation, judicial economy, certainty in legal relations, and fairness to the defendant. *See Kremer v. Chemical Const. Corp.*, 456 U.S. 461, 466 n. 6, 102 S.Ct. 1883, 1889 n. 6, 72 L.Ed.2d 262 (1982). A party invoking *res judicata* must establish three essential elements: "(1) a final judgment on the merits

in a prior suit, (2) an identity of the cause of action in both the earlier and the later suit, and (3) an identity of parties or their privies in the two suits." *Meekins v. United Transp. Union*, 946 F.2d 1054, 1057 (4th Cir.1991) (quoting *Keith v. Aldridge*, 900 F.2d 736, 739 (4th Cir.), *cert. denied*, — U.S. ——, 111 S.Ct. 257, 112 L.Ed.2d 215 (1990)); *Nash County Bd. of Educ.*, 640 F.2d at 486. Here, the parties in *Buckeye I* and this suit are identical. Moreover, for purposes of *res judicata*, the decision in *Buckeye I* was final. *See Turshen v. Chapman*, 823 F.2d 836, 839 (4th Cir.1987) (The *res judicata* final judgment requirement is met when "a particular adversary proceeding has been finally resolved [such that] the outcome constitutes an appealable final decision."). Thus, the critical *res judicata* element in issue here is whether there exists the requisite identity of causes of action in the two suits.

The Fourth Circuit has adopted the Restatement (Second) of Judgments transactional approach to the identity of claims question. *See, e.g., Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir.1986) (citing Restatement (Second) of Judgments, § 24(2) (1982)), *cert. denied*, 480 U.S. 932, 107 S.Ct. 1571, 94 L.Ed.2d 763 (1987); *Keith v. Aldridge*, 900 F.2d at 740 (same). Under the Restatement standard, the critical inquiry is whether "a claim made in the second action involves a right arising out of the same transaction or series of connected transactions that gave rise to the claims in the first action." *Harnett v. Billman*, 800 F.2d at 1314. The scope of the transaction or connected transactions is to be measured by considering factors such as "common origin and relation, as well as whether the acts giving rise to the claim would be considered as part of the same unit by the parties in their business capacities." *Id.* (citing Restatement (Second) of Judgments, § 24(2) (1982)). Applied here, the transactional approach leads to the conclusion that *res judicata* bars Buckeye's and Fostoria's two claims challenging the FCA's § 411 merger Policy Statements.

**11.** Defendant filed a motion to dismiss, or in the alternative, for summary judgment.

Simply put, Buckeye and Fostoria argue that the FCA's Policy Statements purport to implement a substantive provision of § 411 without following the proper procedures.[12] More specifically, Buckeye and Fostoria claim that the FCA's two Policy Statements violate (i) the FCA's implementing statute, 12 U.S.C. § 2252(a)(9), which states that the FCA must prescribe rules and regulations, not policy statements, for implementing statutory provisions, and (ii) the APA, 5 U.S.C. §§ 551–557, which states that substantive agency rules must be subject to notice and comment procedures. Buckeye and Fostoria are barred by the doctrine of *res judicata* from relitigating these claims here now because they arise out of the same transaction or series of connected transactions that gave rise to their claims in *Buckeye I*, namely, the FCA's denial of their charter amendment applications. These FCA denials were connected transactions because they had a common origin and relation—the same charter amendment applications were being considered by the FCA on both occasions and the FCA relied on the same Policy Statements in denying them. *Buckeye I* was therefore the appropriate occasion for Buckeye's and Fostoria's attack on the validity of the Policy Statements. Their failure to mount the attack then is fatal to their attempt to do so now. *See Meekins,* 946 F.2d at 1057 (*res judicata* bars not only claims that were previously raised and fully litigated, it also "prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.") (citations omitted).

 But *res judicata* does not bar the core of Buckeye's and Fostoria's complaint, namely, their challenge to the validity of Mid–America's charter, as issued by the FCA. This claim does not involve "a right arising out of the same transaction or series of connected transactions" that gave rise to *Buckeye I. Harnett v. Billman,* 800 F.2d at 1314. Buckeye's and Fostoria's claim challenging Mid–America's charter focuses on the FCA's issuance of Mid–America's charter, not on the FCA's denial of Buckeye's and Fostoria's charter amendment requests. Here, the gravamen of the claim is not the FCA's denial of Buckeye's and Fostoria's charter amendment applications but rather the power of the FCA to issue Mid–America a charter that allows Mid–America to compete in Buckeye's and Fostoria's exclusive territories. Buckeye's and Fostoria's right to challenge Mid–America's charter would exist even had the FCA granted Buckeye's and Fostoria's charter amendment requests because the rights at issue here and those at issue in *Buckeye I* do not share a common origin. *See id.* at 1314 (one factor in measuring scope of transaction is to consider common origin or relation). Accordingly, the Court must proceed to consider the merits of Buckeye's and Fostoria's claims challenging the validity of Mid–America's charter.[13]

---

12. Buckeye and Fostoria claim that the Policy Statements alter the rights of System institutions by prescribing the only available remedy for associations affected by § 411 mergers, *i.e.,* converting themselves to ACAs.

13. In addition to *res judicata,* the FCA argues that Buckeye's and Fostoria's claims are barred by the procedural doctrines of waiver and laches. Neither doctrine is applicable here. With respect to laches, the FCA cannot demonstrate unjustifiable delay and prejudice due to Buckeye's and Fostoria's two year-old challenge to Mid–America's charter. *See* Rule 8(c), Fed. R.Civ.P.; *White v. Daniel,* 909 F.2d 99, 102 (4th Cir.1990), *cert. denied,* — U.S. —, 111 S.Ct. 2916, 115 L.Ed.2d 1079 (1991). Unjustifiable delay does not exist where, as here, the action is brought well within the six year statute of limi-

tations for civil suits against the United States. *See* 28 U.S.C. § 2401; *Walters v. Secretary of Defense,* 725 F.2d 107, 113 (D.C.Cir.1983) (agency action should not be precluded from judicial review when an action is brought within the six year statute of limitations), *reh'g den. en banc,* 737 F.2d 1038 (D.C.Cir.1984). Nor can the FCA prove it has been prejudiced by the delay. This is a case of pure statutory construction. Thus, the delay has not prejudiced the FCA in its ability to present the merits of its case because the case does not depend on the fading memories of witnesses or evidence that may have been destroyed. *Cf. Onslow County v. United States Dep't of Labor,* 774 F.2d 607, 612 (4th Cir.1985) ("Waiver of a rule designed to allow an agency to reach a correct decision on the merits concerning liability of a party claiming the benefit of the rule will cause legally cognizable prejudice if the party is injured in its ability

## B. The Validity of the Mid–America Charter

█ The pivotal questions presented are ones of statutory construction. First, whether the FCA's issuance of Mid–America's charter violated Buckeye's and Fostoria's statutory right to disapprove of the merger. And second, even if Buckeye and Fostoria did not have a right to disapprove the merger, the question remains whether the FCA violated Buckeye's and Fostoria's previously acquired statutory rights by granting to Mid–America the right to compete with Buckeye and Fostoria in their formerly exclusive territories.

With respect to the first question, Buckeye and Fostoria argue that Mid–America, which resulted from a § 411 merger of the Fourth District PCA and FLBA, was, in essence, a district-wide merger under § 5.17(a)(2).[14] As such, Buckeye and Fostoria claim that they had the clear and unambiguous right under § 5.17(a)(2) to disapprove of the merger that formed Mid–America.[15] The FCA cites two reasons why this is not so. First, as § 5.17(a)(2) is interpreted by the FCA, no merger is district-wide unless its proposed territory covers the entire district. Mid–America's proposed territory did not cover the entire Fourth District. Thus, the merger that formed Mid–America was not district-wide. Second, the FCA argues that a § 5.17(a)(2) district-wide merger must involve a mini-

mum of three institutions—the two institutions that merge, and a third association that did not approve the merger. A § 411 merger, on the other hand, involves only two associations that share substantially the same territory within a district.[16] Thus, as these statutory provisions are construed by the FCA, where, as here, two associations agree to merge under § 411, there is no dissenting third association that needs to be afforded a remedy.

█ Ultimately, the disposition of this issue turns on this Court's review of the FCA's construction of §§ 5.17(a)(2) and 411. The standards for judicial review of an agency's construction of the statute it administers are set forth in *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). There, the Supreme Court said:

When a court reviews an agency's construction of the statute which it administers, it is confronted with two questions. First, always, is the question whether Congress has directly spoken to the precise question at issue. If the intent of Congress is clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress. If, however, the court determines Congress has not directly addressed the precise question at issue, the court does not sim-

___

to present its case on the merits."). Moreover, the FCA has no valid interest in maintaining or continuing to take actions that may, in fact, violate the statute.

. Waiver is also inapplicable because Buckeye and Fostoria did not intentionally abandon their right to challenge Mid–America's charter simply by not raising it at the time they challenged the FCA's denial of their charter amendment applications. *See NCNB Nat'l Bank of N. Car. v. Tiller*, 814 F.2d 931, 938 (4th Cir.1987) (waiver constitutes the intentional abandonment of a known right, "not a mere trick to catch one napping"), *rev'd on other grounds*, 896 F.2d 833 (4th Cir.1990).

**14.** This argument stems from Buckeye's and Fostoria's belief that the Fourth District PCA and FLBA were district-wide mergers. It follows, they argue, that the merger of two district-wide associations could result in nothing less than another district-wide institution.

**15.** Section 5.17(a)(2) states, in pertinent part, "In issuing charters and certificates of territory for district-wide mergers of associations where stockholders of one or more associations did not approve the merger, the charter of the new or merged association shall not include the territory of the disagreeing association or associations[.]"

**16.** Section 411 provides, in pertinent part:

Not later than 6 months after the date of the merger of the Federal land bank and the Federal intermediate credit bank in a district, the Boards of Directors of each federal land bank association and each production credit association in such district, that share substantially the same geographical territory with each other, shall submit to the voting stockholders of each such association for their approval, a plan, approved by the supervising bank and the Farm Credit Administration, for merging such associations.

ply impose its own construction on the statute. . . . Rather, if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute.

*Id.* at 842–43, 104 S.Ct. at 2781–82. *See also Zapata v. Barnard,* 933 F.2d 256, 258 (4th Cir.1991); *First South PCA v. FCA,* 926 F.2d 339, 343 (4th Cir.1991); *Bahnmiller v. Derwinski,* 923 F.2d 1085, 1089 (4th Cir.1991).[17]

Applied here, the first inquiry under *Chevron* is whether Congress' intent is clear on the precise question presented, namely, whether § 5.17(a)(2)'s "district-wide" merger protection afforded to a dissenting association applies at the time of a § 411 merger. To determine congressional intent, the Court looks first to the precise language of § 5.17(a)(2), which states, in pertinent part, "In issuing charters and certificates of territory for district-wide mergers of associations where stockholders of one or more associations did not approve the merger, the charter of the new or merged association shall not include the territory of the disagreeing association or associations." This Court finds that the term "district-wide", as used in the statute, is clear and unambiguous: It means the territory of the entire district.[18] In the context of § 5.17(a)(2), the phrase "district-wide" means a merger of associations that covers the entire territory of a district, except the territory of associations within the district that did not approve the merger. In the case at bar, Mid–America was never proposed as a merger of all of the associations that cover the entire territory of the Fourth District. Had such been the case, Buckeye and Fostoria would have had a § 5.17(a)(2) right to disapprove of the merger. On the contrary, Mid–America was proposed as a § 411 merger of the Fourth District PCA and the Fourth District FLBA, neither of which covered the

**17.** Further, an agency's "interpretation" of a statute need not be embodied in a rule or regulation in order to be accorded deference under *Chevron. See FDIC v. Philadelphia Gear Corp.,* 476 U.S. 426, 439, 106 S.Ct. 1931, 1938–39, 90 L.Ed.2d 428 (1986) (agency's understanding of statute had been fortified by its behavior over the following decades and thus, the Court accorded it the same weight as an agency regulation); *Deel v. Jackson,* 862 F.2d 1079, 1087 (4th Cir.1988) (same), *cert. denied,* 490 U.S. 1092, 109 S.Ct. 2434, 104 L.Ed.2d 991 (1989).

**18.** Legislative history of the 1985 Amendments supports this interpretation of the term "district-wide". As no committee reports on the adopted language define the term, the most insightful legislative history on this point is found in floor debates concerning proposed amendments that contained language similar to that ultimately adopted. For example, Senator Boren proposed an amendment that described a "district-wide association" as an association comprised of "all the like associations within a district." 131 Cong.Rec. § 16,730 (daily ed. Dec. 3, 1985 (amendment of Sen. Boren). Also, Senator McClure explained that the term "district-wide" as used in § 5.17(a)(2) meant the territory of an entire district by way of an illustration: In the Twelfth District, all of the PCAs except one decided to merge. The territory of the merged PCA covered the entire territory of the Twelfth District, including the territory of the disagreeing PCA. Thus, the remedial provisions of § 5.17(a)(2) were intended to .cure this very

problem—a district-wide association that invaded the territory of a dissenting non-district-wide association. *See* 131 Cong.Rec. S16,733–34 (daily ed. Dec. 3, 1985) (statement of Sen. McClure).

But having cited this supporting legislative history, the Court feels constrained to note that the best and most reliable indication of legislative intent is the statutory language itself. Legislators' floor or committee statements are far less reliable as they are often partisan efforts to dictate to courts how to resolve a legislative impasse or compromise hidden in statutory ambiguities. No better example of this exists than the conflicting statements of lawmakers on the Civil Rights Act of 1991. *Compare* 137 Cong.Rec. H9,512 (daily ed. Nov. 7, 1991) (statement of Rep. Hyde) ("[The Act and the amendments made by the Act] have no application to pending cases or to cases arising before the effective date of the act.") *with* 137 Cong.Rec. H9,530 (daily ed. Nov. 7, 1991) (statement of Rep. Edwards) (explaining that the provisions of the Act shall apply to pending cases, except in two instances where the Act makes an explicit provision to the contrary). *See Khandelwal v. Compuadd Corp.,* 780 F.Supp. 1077, 1079 (E.D.Va.1992) (noting that the legislative history behind the Civil Rights Act was both "partisan and unclear"—republican senators and representatives made statements against retroactivity while democratic senators and representatives made statements in favor of retroactivity). *See generally* Note, *Why Learned Hand Would Never Consult Legislative History Today,* 105 Harv. L.Rev. 1005 (1992).

entire territory of the Fourth District.[19] A § 411 merger necessarily involves only two associations—an FLBA and a PCA sharing substantially the same territory. As neither Buckeye nor Fostoria were one of these associations, they had no right to disapprove of the merger at the time Mid–America was formed.

In sum, this Court holds that by using the unambiguous phrase "district-wide" in § 5.17(a)(2), Congress made unmistakably clear its intent to limit that section's application to mergers involving the territory of an entire district, except the territory of associations within the district that did not approve the merger. By contrast, § 411 mergers need not be "district-wide". Thus, the FCA correctly asserts that Buckeye and Fostoria had no § 5.17(a)(2) right to disapprove of Mid–America at the time of its § 411 merger because Mid–America was not proposed or approved by the FCA as a merger covering the entire territory of the Fourth District.[20]

■ But this does not end the analysis of the validity of Mid–America's charter. Yet to consider is whether Buckeye and Fostoria had any previously acquired rights that carried over to protect their exclusive territories from being included in Mid–America's chartered territory. If so, the FCA erred in issuing Mid–America a conflicting charter. Buckeye and Fostoria argue that their exclusive territories are protected under their previously acquired § 5.17(a)(2) rights, which arose when they chose not to join the district-wide mergers of Mid–America's predecessor associations. The issue of previously acquired § 5.17(a)(2) rights is hotly contested. The FCA contends that Buckeye and Fostoria have no previously acquired § 5.17(a)(2) rights because the mergers of the Fourth District PCA and FLBA were not district-wide.[21]

As it happens, however, the question of whether the mergers of the Fourth District PCA and the Fourth District FLBA were "district-wide" under § 5.17(a)(2) need not be answered.[22] Instead, the essential point

19. The fact that Mid–America covers most of the territory of the Fourth District is immaterial. It was not a proposed merger involving all of the associations that cover all of the territory of the Fourth District. Thus, although it comes close to being a district-wide merger by virtue of the amount of territory it covers, Mid–America was not a district-wide merger.

20. Even if the pertinent language of the statutes at issue were unclear, this Court finds that the FCA has interpreted the statutes in a reasonable manner and thus, upholds the agency's interpretation. *See Bahnmiller v. Derwinski,* 724 F.Supp. 1208 (E.D.Va.1989), *aff'd in part and vacated as moot in part,* 923 F.2d 1085, 1090 (4th Cir.1991) ("agency's interpretation of the statute [must be upheld] as long as it is 'rational and consistent with the statute.'") (citations omitted).

21. The FCA claims that these two mergers were not district-wide because the merger proposals were not presented to the stockholders of every PCA and FLBA in the Fourth District for approval or disapproval, as required by regulation. *See* 12 C.F.R. § 611.1125(a) ("When issuing charters or certificates of territory for district-wide mergers or consolidations of associations, the Farm Credit Administration will not issue any charters or certificates of territory that include the territory of one or more associations whose stockholders *voted to disapprove* the merger or consolidation.") (emphasis added). *See also supra* note 1.

This regulation, in Buckeye's and Fostoria's view, contradicts the plain meaning of the words "where stockholders ... did not approve the merger" in § 5.17(a)(2). They argue that the statutory words require an affirmative vote to join a district-wide merger, not a vote of disapproval to remain unaffected. Thus, under the plain meaning of § 5.17(a)(2), Buckeye and Fostoria contend that the Fourth District PCA and FLBA were district-wide mergers because they included all of the PCAs and FLBAs of the Fourth District except those where the stockholders did not approve the merger, either by a disapproving vote or no vote. Because Buckeye's and Fostoria's exclusive territories were excluded from the chartered territories of the Fourth District PCA and FLBA, respectively, they claim this exclusion carried over and continued to protect their territories when the Fourth District PCA and FLBA merged to form Mid–America.

22. Because the ultimate outcome in this case does not depend on whether or not these mergers were district-wide, the Court need not reach the question of whether 12 C.F.R. § 611.1125(a) (1991), the FCA's implementing regulation contradicts 12 U.S.C. § 2252(a)(9), the FCA's governing statute, and should be set aside as arbitrary and capricious. *See* 5 U.S.C. § 706(2)(C) (courts must set aside regulations that do not conform to the statute they seek to implement); *Espinoza v. Farah Mfg. Co.,* 414 U.S. 86, 94–95, 94 S.Ct. 334, 339–40, 38 L.Ed.2d 287 (1973) (regulation due no deference when it contradicts plain congressional intent).

here is that, whatever type of merger created the Fourth District PCA and the Fourth District FLBA, Buckeye and Fostoria chose not to join those merged associations. Accordingly, the FCA did not include Buckeye's exclusive territory in the Fourth District PCA's chartered territory, nor did it include Fostoria's exclusive territory in the Fourth District FLBA's chartered territory.[23] *See* 12 U.S.C. §§ 2071(b)(7), (8), 2091(b)(4), (c) (Each PCA and FLBA must obtain an FCA charter specifying the territory it may serve). Thus, the Fourth District associations, Mid–America's predecessors, were constrained by their charters from competing with Buckeye and Fostoria in Buckeye's and Fostoria's exclusive territories. *See* 12 C.F.R. §§ 614.4030, 614.4040 (1991) (No PCA or FLBA may lend outside its FCA chartered territory unless it complies with § 614.4070). Buckeye had the right to lend exclusively within its separate territory unless it granted the Fourth District PCA the right to lend there. The same holds true for Fostoria with regard to the Fourth District FLBA. *See* 12 C.F.R. § 614.4070(c) (1991) (An association can only lend outside of its chartered territory if it first obtains the approval of the System institution that would regularly serve that borrower.). Yet when the Fourth District PCA and FLBA merged, pursuant to §§ 411 and 7.8, the

FCA issued Mid–America a charter stating that Mid–America was authorized "to exercise all powers conferred on the Association under the Act and the regulations of the Farm Credit Administration." Amicus Curiae Brief of Farm Credit Services of Mid–America, A.C.A. at 2. Specifically, the FCA granted Mid–America the power, under § 7.8, to make long, intermediate, and short-term loans throughout its chartered territory, without restriction.[24] In granting this charter to Mid–America, the FCA granted to the merged entity rights beyond those enjoyed by its constituent associations and significantly reduced the rights of Buckeye and Fostoria. Specifically, Mid–America, under its charter, could now compete directly with Buckeye in the two counties where Buckeye previously had the exclusive right to offer short-and intermediate term loans. Likewise, Mid–America could now compete with Fostoria in the seven counties where Fostoria had previously enjoyed the exclusive right to offer long-term loans. The question, therefore, is whether, in granting Mid–America these powers, the FCA correctly construed § 7.8.

Again applying *Chevron*, the starting point for reviewing the FCA's interpretation of § 7.8 is the statute itself. Section 7.8 states, in pertinent part:

> Except as otherwise provided by this subchapter, a merged association shall—

---

Moreover, because this decision does not rest on a finding that § 5.17(a)(2) rights are involved, Senator Boren's amicus curiae briefs, arguing that Congress intended § 5.17(a)(2) rights to carry-over after a § 411 merger, are irrelevant. Indeed, had the Court addressed the question of carry-over rights under § 5.17(a)(2), it would not have accorded Senator Boren's post-enactment comments much weight in determining congressional intent. *See Bread Political Action Comm. v. Federal Election Comm'n*, 455 U.S. 577, 582 n. 3, 102 S.Ct. 1235, 1238 n. 3, 71 L.Ed.2d 432 (1982) (post-enactment affidavits by sponsor of legislation carried no probative weight, but represented only personal views of that legislator); *County of Washington v. Gunther*, 452 U.S. 161, 176 n. 16, 101 S.Ct. 2242, 2251 n. 16, 68 L.Ed.2d 751 (1981) (contradictory post-passage comments of congressmen entitled to no weight at all). This Court is also persuaded by Justice Scalia's recent remark that arguments based on post-hoc statements of legislators "should not be taken seriously, not even in a footnote." *Sullivan v. Finkelstein,* 496 U.S.

617, 632, 110 S.Ct. 2658, 2667, 110 L.Ed.2d 563 (1990) (Scalia, J., concurring in part).

**23.** As previously noted, however, the Fourth District FLBA's chartered territory included the two counties where Buckeye operated separately from Fostoria, and the Fourth District PCA's chartered territory included the seven counties where Fostoria operated separately from Buckeye.

**24.** Because the Fourth District PCA had the power to offer short and intermediate-term loans throughout its chartered territory, which included the seven counties where only Fostoria could make long-term loans, the FCA granted Mid–America the power to offer long-terms loans in Fostoria's territory. And because the Fourth District FLBA had the power to offer long-term loans throughout its chartered territory, which included the two counties where only Buckeye could make short and intermediate-term loans, the FCA granted Mid–America the power to offer short-term loans in Buckeye's territory.

**590**

(A) possess all powers granted under this chapter to the associations forming the merged association; and

(B) be subject to all of the obligations imposed under this chapter on the associations forming the merged association.

12 U.S.C. § 2279c–1(b)(1). Here, the congressional intent, reflected in the statute's plain language, is that the obligations of the constituent entities must be imposed upon the merged association in addition to the powers the merged association receives from its constituent entities. The parallelism of the language in subsections (A) and (B) reinforces this intent. In essence, a merged association receives all of the powers that its merging associations had under the statute, but is also subject to all of their obligations.[25] Given this, the inevitable conclusion is that the FCA misconstrued the clear meaning of § 7.8 when it granted Mid–America's charter. The fatal flaw in the charter is that the FCA failed to impose the § 7.8 obligations of the Fourth District PCA and FLBA on Mid–America. Under the statute and the accompanying FCA regulations, the Fourth District PCA and FLBA were obligated to lend only within their chartered territories, which did not include Buckeye's two exclusive counties or Fostoria's seven exclusive counties, respectively. Under § 7.8, these obligations carried over and should have been imposed upon Mid–America by the FCA when it issued the charter. The FCA cannot grant Mid–America the power to offer long-term loans in Fostoria's exclusive seven counties because the Fourth District FLBA had an obligation not to make long-term loans there. This obligation exists regardless of the Fourth District PCA's power to make short-term loans in that same territory. Likewise, the FCA cannot grant Mid–America the power to offer short and intermediate-term loans in Buckeye's exclusive two counties because the

Fourth District PCA had an obligation not to make short and intermediate-term loans there. The Fourth District FLBA's power to make long-term loans in that same territory does not erase this obligation.

*Conclusion*

In sum, this Court holds that the FCA misconstrued the clear meaning of § 7.8 in granting Mid–America all of the powers of its merging associations without subjecting it to the corresponding obligations—the obligation to forbear from making long-term loans in Fostoria's exclusive seven counties absent Fostoria's concurrence and the obligation to forbear from making short and intermediate-term loans in Buckeye's exclusive two counties absent Buckeye's concurrence.

---

**25.** The FCA argues that the § 7.8 "obligations" are limited to the obligations imposed upon the merging associations by the previous statutory section entitled "Mergers, Transfers of Assets, and Powers of Associations Within a District", § 2279b–d. This argument is refuted by the plain language of § 7.8, which states that a merged association shall "be subject to *all of the obligations imposed under this chapter* on the associations forming the merged association." § 2279c–1(b)(1)(B) (emphasis added). More-

over, the FCA cannot claim, on the one hand, that Mid–America receives all of the powers that its merging associations had under the Act, and claim, on the other hand, that Mid–America is subject only to the obligations of its merging associations that appear in one section under the Act. Section 7.8 is pellucidly clear: just as Mid–America receives all of the powers of its merging associations, so also does it inherit all of their obligations.