# CIRCUIT COURT OF FAIRFAX COUNTY

Bennie H. Potter

v.

Robert L. Travers,
Matthew D. Robinson,
and River Junction, L.P.

December 18, 1997

Case No. (Chancery) 145725

BY JUDGE ARTHUR B. VIEREGG, JR.

Complainant Bennie H. Potter filed a bill of complaint initiating this cause against defendants Robert L. Travers and Matthew D. Robinson on August 22, 1996. Potter seeks to be named liquidating trustee to wind up the affairs of the River Junction, Limited Partnership ("River Junction"). He alleges that Travers, the sole general partner of River Junction, dissolved the partnership in contravention of the River Junction partnership agreement by purchasing the partnership's development loan obligation, secured by the partnership's sole asset, land located in Spotsylvania County, Virginia, by causing the foreclosure sale of that land and by purchasing the land with his wife at that foreclosure sale for their personal accounts. Travers contends the partnership already had been wound up and terminated when this suit was filed, and further, Potter's suit is barred by the doctrine of laches. Other defendants named in the bill of complaint, another limited partner, Matthew D. Robinson, and the partnership itself have not filed responsive pleadings.

*Facts*

On November 6, 1997, this Court received evidence and heard oral argument. The following facts, most of which are not contested, frame the issues in this case.

On March 14, 1989, River Junction was formed to acquire 268.4 acres of land in Spotsylvania County, Virginia, and then to develop that land for sale of residential lots. River Junction had one general partner, Travers, and three limited partners: Travers, Potter, and Robinson.

The River Junction partnership agreement provided, in part, as follows:

> *Article III*: The partnership shall commence as of the date of this agreement and shall continue for fifty (50) years unless dissolved earlier, as provided hereafter in this agreement . . . .
>
> *Article VII, ¶ 2*: The limited partners shall not have responsibility for or be required to contribute any additional funds over and above their initial capital contribution. It being the responsibility of the general partner to cover the carrying operating costs and/or pay off the remaining balance of the deed of trust . . . .
>
> *Article X, ¶ 3*: The general partner shall have the right, power, and authority (without regard to the term of the partnership), acting for and on behalf of the partnership, to lease, sell, mortgage, convey, refinance, grant easements on or dedicate the property (or any part thereof) of the partnership . . . to convey such partnership property in fee simple by deed, mortgage, or otherwise . . . .
>
> *Article X, ¶ 4*: It is anticipated that the general partner will arrange for additional financing as may be deemed appropriate and shall assume all responsibility for producing additional funds or capital contributions which are required to be made to the partnership.
>
> *Article XVII, ¶ 1*: [N]o partner shall have the right to cause dissolution of the partnership before the expiration of the term for which it is formed.

In 1988, Travers contracted to purchase the Spotsylvania land. Following the execution of the River Junction partnership agreement, however, on March 27, 1989, Travers caused the seller to convey the land to River Junction for $700,000.00. On the same day, the Shenandoah Savings Bank of Martinsburg, West Virginia ("Shenandoah Savings") loaned River Junction $1.8 million for the acquisition and development of the Spotsylvania land.

The River Junction partners and their wives each guaranteed repayment of the development loan. The loan was secured by the Spotsylvania land.

River Junction proceeded to develop and subdivide the Spotsylvania land. The limited partners made only minor capital contributions. Hence, the Shenandoah Savings loan proceeds constituted virtually all of the funds available for these activities.

On account of the real estate recession impacting the Northern Virginia real estate market in 1989 and the early 1990s, River Junction was unable to sell lots. In the course of this recession, the Shenandoah Savings development loan was refinanced from time to time. By the terms of the last refinancing in December, 1991, Travers and his wife and Potter and his wife (but not Robinson and his wife) executed a First Modification to Amended and Restated Promissory Note in favor of Shenandoah Savings in the amount of $1,311,943.98. River Junction later defaulted on that loan. The Resolution Trust Corporation eventually acquired Shenandoah Savings and thus the River Junction development loan. An appraisal received by the RTC valued the property at only $410,000.00.

Travers testified that, although foreclosure by the RTC loomed, both Potter and Robinson refused to contribute additional funds to the partnership. He further testified he therefore had two options: he could place River Junction in bankruptcy, or he could personally purchase the River Junction note from the RTC. With written notice to Potter and Robinson, Travers elected to purchase the River Junction note, not alone, but with his wife. RTC assigned the note to Travers and his wife on March 5, 1993.

On June 25, 1993, the Traverses substituted their attorney, John Connor, as trustee under the deed of trust securing the RTC note and directed Connor to advertise the foreclosure sale of the Spotsylvania land. Shortly before the sale, Potter's attorney, Richard Bartl, inquired of Connor as to the future of the River Junction partnership, noting that under the parties' partnership agreement, Travers had been obligated "to cover the carrying operating costs and/or pay off the remaining balance of the [Shenandoah] deed of trust . . . ." Def. Ex. 5, Article VII, ¶ 2. Connor responded by letter dated September 10, 1993, stating that under the River Junction partnership agreement, Travers, as general partner, while obligated to arrange for additional financing and to produce additional funds or to make capital contributions, was also entitled to place the partnership into bankruptcy and wind up its affairs. Connor further stated:

> There can be absolutely no doubt that this is the final year of the Partnership, and it will be wound up, one way or another, by De-

cember 31, 1993. Mr. Travers is amenable to working with the other limited partners for an orderly, agreeable dissolution of the Partnership, or, if necessary, he will proceed to an unorderly dissolution of the Partnership, both as general partner in accordance with the Partnership Agreement and as noteholder of the Shenandoah Note and using the enforcement provisions of the guarantees signed by your client and Mr. and Mrs. Robinson under the law of contribution.

Def. Ex. 3.[1] No meaningful conversations or dealings were thereafter held between Travers or Connor with Potter or Bartl.

Connor proceeded to conduct a foreclosure sale of the Spotsylvania land on October 29, 1993. Only Travers and his wife, Connor, and the auctioneer attended. Travers and his wife purchased the land for $400,000.01. On November 29, 1993, Connor conveyed the property to Travers and his wife as "trustees." Connor's accounting filed with the Spotsylvania Commissioner of Accounts stated the RTC/Shenandoah development loan balance on the date of the foreclosure was $912,717.64, and the loan deficiency, after payment of foreclosure costs, was $519,178.88. A check paid to the Commissioner of Accounts in connection with the sale was made by check drawn on the River Junction, Ltd. Partnership, Operating Account.[2]

Travers thereafter paid the debts of the partnership and caused a final 1993 tax form, Schedule K-1, for River Junction to be sent to Potter and Robinson. This 1993 River Junction, Limited Partnership, tax form shows an ordinary loss from trade or business activity of $1,224,513.00. Potter claimed a share of the partnership losses in his personal tax returns from 1994 until 1996. Travers relies on River Junction's 1993 tax return as a final accounting, winding up, and termination of the partnership. Those tax returns, however, while containing conclusory statements of the contributions made by the respective partners, contain no details as to the transactions upon which the capital contribution figures for River Junction's part-

---

[1] Further, Connor noted that Potter had contributed $14,429.00 to the partnership and had received $13,045.00 in distributions; and Robinson had contributed $10,344.00 to the partnership and had received $10,437.00 in distributions. Travers' own contributions and distributions were noted as being, respectively, $286,717.00 and $28,701.00. Connor stated that these figures were based upon "[a] review of the financial records of the Partnership since its inception ... as taken from the Partnership tax returns ...." Def. Ex. 3. The tax returns were apparently furnished to Bartl. *Id.*

[2] Most of the facts recited in this paragraph are reflected in Def. Ex. 4.

ners or income tax loss figures were calculated. Similarly, no detail is afforded with respect to income and expense figures of the partnership. *See* Pl. Ex. 15.

Travers never directly or indirectly heard from Potter after the foreclosure sale until Potter filed this suit in August, 1996. In the meantime, however, Travers and his wife invested additional personal funds into the subdivision and began selling lots in 1994. They have continued to market the remainder of the lots under the "River Junction" name. Travers testified at trial that his decisions to buy the River Junction note, to foreclose, and to buy the Spotsylvania land were necessitated by the RTC's imminent foreclosure of the note and his partners' failure to make contributions to the venture.

## Decision

In this cause, Potter contends Travers dissolved the limited partnership in contravention of the Partnership Agreement. Therefore, he maintains that Travers' dissolution was wrongful, and hence, Travers did not have the authority to wind up and terminate River Junction. Travers disagrees. He argues the River Junction dissolution was voluntary and authorized by Article 17.2 of the Partnership Agreement. Further, Travers argues Potter's delay in filing this case for almost three years following his constructive receipt of Connor's September 1993 letter bars his entitlement now to cause a winding up of the partnership accounts.

### A. *Dissolution*

Pursuant to Virginia partnership law, two steps are required to terminate a partnership. First, the partnership must voluntarily or involuntarily be dissolved. Virginia Code §§ 50-73.49 *et seq.* Second, the affairs of the partnership must be wound up. Virginia Code § 50-30. The duty to wind up a partnership's affairs is the responsibility of the general partner, unless the general partner's actions in contravention of the partnership agreement caused the dissolution. Virginia Code § 50-73.51. In the latter circumstance, a limited partner (if there is no other general partner) may be authorized to wind up the affairs of the partnership. Virginia Code § 50-73.51(A).

Although both Travers and Potter agree River Junction has been dissolved, they do not concur as to the basis for the dissolution. Travers contends Potter and Robinson implicitly agreed to the dissolution of the River

Junction Partnership by virtue of their failure to contest either the purchase by Travers and his wife of the RTC note or the Traverses' foreclosure sale of the RTC note. This putative agreement of voluntary dissolution is based on Connor's September 10, 1993, letter suggesting voluntary dissolution and threatening Potter, Robinson, and their wives with a suit on the note guaranty in the event they did not agree to a voluntary dissolution. The record, however, does not demonstrate that either Potter or Robinson agreed to (i) the partnership's dissolution or (ii) Travers' foreclosure sale of the River Junction property. Nor can such an intention be assumed in view of Travers' explicit affirmative responsibility "to pay off the remaining balance of [the] deed of trust," Partnership Agreement Article 7.2, and the lack of any duty on the part of the limited partners to make further contributions to the partnership. The evidence does not support Travers' argument that the partnership was voluntarily dissolved.[3]

On the contrary, the evidence presented demonstrates that Travers, by joining with his wife to buy the note and to cause the foreclosure sale of the property, dissolved the partnership in contravention of his duties under the partnership agreement. *See* Partnership Agreement, Article VII, ¶ 2. He did not have authority to buy the partnership property pursuant to the partnership agreement, his actions constituting self dealing divesting the partnership of its only significant asset. Virginia Code § 50-21; *Klotz v. Klotz*, 202 Va. 393 (1961) (holding that the relationship of partners is of a fiduciary character and imposes upon them the obligation to exercise good faith and integrity in their dealings); *Lindsay v. Bevins*, 204 Va. 74, 77 (1963) (noting that a partner may not acquire an interest in the subject matter of the relationship adverse to the other partners). Furthermore, he had earlier violated his obligation to pay the note later purchased by his wife and him.[4] Partnership Agreement, Article VII, ¶ 2.

---

[3] Indeed, in his letter of September 10, 1993, Travers' attorney professed Travers' amenability to a voluntary dissolution, but neither Travers nor the limited partners took action with respect to that suggestion.

[4] Travers rationalizes his actions on the basis of the imminent foreclosure by the RTC and the failure of his partners to contribute needed capital. But, Travers was not forced to sign a partnership agreement obligating him to pay the development loan, despite the fact that the limited partners merely agreed to contribute limited funds and pledge their credit. In a word, the evidence suggests he made a poor business deal and sought to extricate himself from it by taking steps inconsistent with his obligations to the partnership and his partners.

## B. *Laches*

The gravamen of Travers' laches argument is that Potter delayed almost three years before filing this lawsuit. Travers emphasizes that in the meantime Potter took advantage of the River Junction losses and, further, that Travers and his wife expended significant sums of money in developing the Spotsylvania land.

Travers contends Potter's deductions for River Junction losses on his taxes and the Traverses' investments to sell and develop the Spotsylvania land, coupled with Potter's delay of almost three years in filing this cause, preclude him from winding up the River Junction partnership business.

The appropriate starting point in determining whether a party has delayed too long in asserting equitable rights is a comparison of the period of delay with an analogous limitations period. *Moore v. Exxon Transportation Co.*, 502 F. Supp. 583 (E.D. Va. 1980). Here, Travers' conduct constituting dissolution in contravention of the River Junction Partnership Agreement was his failure to pay the RTC loan in violation of his duties under the Partnership Agreement. The law recognizes a five-year limitations period for such a breach of a written agreement. Virginia Code § 8.01-246. Furthermore, the statute of limitations for settling partnership affairs does not begin to accrue at the time of dissolution. Instead, the law recognizes a five-year period that begins to run at the completion of winding up the affairs of the dissolved partnership. Virginia Code § 8.01-246(3); *Dulles Corner Properties v. Smith*, 246 Va. 153, 156 (1993); *Roark v. Hicks*, 234 Va. 470, 475 (1987). Additionally, laches is not based on the passage of any specific period of time. *Pulaski & Giles Mut. Ins. Co. v. Downs*, 165 Va. 106 (1935). Accordingly, unless Travers can demonstrate that he was inequitably prejudiced by Potter's delay in filing this cause, his laches defense fails. *See, Finkel Outdoor Products, Inc. v. Bell*, 205 Va. 927 (1965); *Buckeye Production Credit Ass'n v. Farm Credit Admin.*, 787 F. Supp. 578 (E.D. Va. 1992), *rev'd on other grounds*, 997 F.2d 11 (4th Cir. 1993).

But, Travers has not demonstrated prejudice by Potter's tax deductions. Travers did not rely on Potter's actions in claiming partnership losses on individual tax returns.[5] Indeed, there is no evidence Travers was aware of Potter's tax filings until after this suit was filed. Accordingly, this circumstance is no basis for his assertion of laches.

---

[5] Moreover, Potter did not file his 1994 tax return until November 5, 1994, thereby effectively shortening by a year the time Travers could have relied on Potter's tax returns as a basis for his laches argument. *See* Defendant's Exhibit # 2.

Similarly, Travers' contention that his wife and he have continued to invest time and money in developing the Spotsylvania land does not demonstrate detrimental reliance on their part of Potter's failure to file this suit. First, the Traverses' most substantial investment with respect to the River Junction Subdivision was their purchase of the RTC note. But that 1993 purchase was made before Potter was informed that Travers and his wife intended to sell the Spotsylvania land, thereby extinguishing River Junction's ownership of that land. *See* Def. Ex. 3. Their purchase of the land was therefore motivated, as Travers himself testified, to salvage the economic fortunes of his wife and himself and not — in any way — in reliance of Potter's position. Moreover, Travers' evidence of the post-foreclosure investments with respect to the development of the property by his wife and him was unspecific. And, presumably such investments, whatever their nature and amount, were necessary irrespective of Potter's position once the Traverses had bought the Spotsylvania land. Their claims of prejudice by Potter's delay in filing suit have not been proven for them to invoke laches.

Furthermore, while Potter's claim that he had not filed suit on account of insufficient resources was testified to in conclusory fashion and was not supported by explicit evidence as to his financial position, his testimony as to his financial condition was not contradicted by Travers. Moreover, Travers' — in any event — is without clean hands. Travers not only (i) violated his partnership obligations by failing to pay the RTC note and thus avert the foreclosure sale of the partnership's principal asset and (ii) purchased the River Junction for his own account and foreclosed upon it in contravention of duties owed to his partners, Travers also threatened to sue those partners, to whom he owed duties of utmost good faith, if they took steps opposing his inequitable course of conduct. Under such circumstances, this court will not entertain his plea that he has been unfairly prejudiced by Potter's delay in filing this suit. While the doctrine of unclean hands generally is applied against a complainant seeking equitable relief, I find no reason to suppose that the doctrine should not also be applied against a defendant who invokes the equitable defense of laches.

## C. *Winding Up*

Following dissolution, a partnership continues until the partnership is wound up. Va. Code § 50-30. Since Travers wrongfully dissolved the partnership, he did not have the authority to wind up the partnership's affairs. And, since he was River Junction's only general partner, the Virginia Part-

nership Act authorizes River Junction's limited partners or a person or persons approved by the limited partners to wind up the partnership. Virginia Code § 50-73.51. Therefore, Potter will be appointed liquidating trustee to take possession of the assets of the River Junction Limited Partnership.

In his capacity as liquidating trustee, Potter is ordered to collect all partnership assets, if any; to liquidate them; to pay all creditors, if any; to distribute any remaining assets of the partnership, if any,[6] pursuant to the terms of the River Junction Partnership Agreement; and to submit a final accounting to all partners. To assist Potter in winding up the partnership's affairs, Travers shall provide Potter with all River Junction books and records.

In accordance with Virginia Partnership law, Potter, in his capacity as liquidating trustee, is further authorized to bring any suits in the name and on the behalf of the limited partnership that may be necessary to wind up and terminate the partnership's affairs. Virginia Code § 50-73.51(B). Potter is not to be compensated for his efforts in winding up the partnership affairs. However, any expense he incurs in winding up the partnership as liquidating trustee, if reasonable, shall ultimately be treated as a partnership expense and shall be paid by the River Junction partners as provided by their partnership agreement.

Mr. Mains is requested to prepare a decree appointing his client liquidating trustee to wind up the affairs of the River Junction Partnership.

---

[6] Mr. Mains has argued that the Spotsylvania land is a partnership asset. The resolution of that issue was not necessary to the decision contained in this letter opinion. Nor could this issue have been decided in this cause in view of the fact that Mrs. Travers, a present co-owner, was not a party.